[No. 20782.   Department Two.   December 15, 1927.]

FRANK D. BLACK, INCORPORATED, *Appellant,* v. CRESCENT MANUFACTURING COMPANY, *Respondent.*[1]

[1] LANDLORD AND TENANT (63)—REPAIRS AND IMPROVEMENTS—RIGHT AND DUTY TO MAKE. An owner, erecting a building for the special purposes of a tenant for a term of years, does not stand in the relation of a contractor, relieved from liability for defective construction in case he follows the specifications furnished by the tenant; and the owner's compliance with a requirement of floors of "laminated construction," does not excuse the use of green lumber, according to a prevailing custom, where that was not good practice and resulted in dry rot, rendering it impossible to use the floors for the tenant's purposes.

[2] SAME (64)—REPAIRS AND IMPROVEMENTS—COVENANTS—IMPLIED WARRANTY—WAIVER. Upon a lease of a new building for a ten year period, there is an implied warranty that its main parts were structurally sound for the life of the lease; and the tenant, by accepting occupancy, does not waive latent defects of which it had no notice and for which it was not responsible; especially where occupancy was given expressly excepting any such waiver.

Appeal from a judgment of the superior court for King county, Beals, J., entered April 13, 1927, upon

¹Reported in 262 Pac. 125.

findings in favor of the defendant, in an action upon contract, tried to the court. Affirmed.

*Grinstead, Laube & Laughlin* and *Peters & Powell*, for appellant.

*Bronson, Jones & Bronson*, for respondent.

Askren, J.—The respondent, for a number of years, has been engaged in the business of manufacturing food in the city of Seattle. In 1922, it desired new quarters and through the instrumentality of B. L. Lambuth, a real estate broker, was brought into touch with the appellant, which owned a suitable tract of land upon which a building adapted to respondent's needs could be built. During the progress of the negotiations, a rough draft was prepared showing the type of structure needed by respondent. Skeleton specifications were drawn which gave an outline of the building and showed the load the floors would sustain. Respondent's requirements were such, on account of much heavy machinery, that all floors were to be capable of sustaining a load of approximately two hundred pounds to the square foot.

Two paragraphs from the skeleton specifications may here be noticed. Under the heading of "Arrangement," were the following:

"First floor to be at car bed level except truck space, basement height 9' clear to ceiling; first floor height 16' clear to ceiling, carrying capacity 250 pounds; second floor and third floor, 12' clear to ceiling, carrying capacity 200 pounds; office and other partitions, stairways, truck spaces, and mezzanine floor, to be constructed as indicated on plan attached; vault with doors to be constructed as indicated on plan."

Under heading "Floors," was the following:

"Basement floor, all of first floor, except section over basement, and floors of truck spaces are to be concrete; other floors shall be 1 inch vertical grain surface on

8 inch laminated construction; mastic finished floors shall be provided at the option of the lessee, provided lessee will pay the difference in cost between mastic and fir finished floors.''

A lease was entered into and the appellant engaged a contractor to construct the building. Respondent moved into the building April 15, 1923, and occupied the same under its lease. Within three months, dry rot had attacked the floors, and its progress was so rapid that, by 1925, it developed that the floors made of laminated construction were unsafe for use, and the city of Seattle, through its superintendent of buildings, gave notice that the entire second and third floor lamination should be removed, to safeguard the lives of the employees. This was mainly caused by the fact that the lumber used in making the laminated floors was green, and since it was covered with an airtight covering of either mastic or tar paper, it could not dry out in the natural way, although respondent's evidence showed other materially contributing factors, such as the use of an unusual percentage of hemlock, sap, and conky lumber, and timbers of insufficient length. The sap lumber comes from the outer part of the tree and contains an unusual amount of sap and moisture. The conky lumber is affected by a parasite before use, which destroys its structural soundness. When investigation showed that the dry rot had progressed to a point where respondent could not safely continue to use the premises, and the parties were unable to come to an agreement thereon, respondent secured another location, and when action was instituted for the rent, sued for its damages.

Upon trial of the action, the court found in respondent's favor. The appellant has sought to limit the hearing in this court to two questions: The main one being, whether the building of the laminated floors out

of green lumber was a structural defect chargeable to it; the other being a question of waiver.

[1]   While the trial court found for respondent on the ground that there was a defect in the original construction, which would include the use of sap, conky and hemlock lumber, together with the use of boards of insufficient length, the greater mass of the testimony revolved around the question of the use of green lumber.   If necessary, the court's decision can be predicated upon all these defects, but since appellant has seen fit to urge that the only vital point considered by the trial court was the use of green lumber, and we feel that our decision can safely be rested thereon, we shall pass over the others.

It will be noticed that the skeleton specifications call for "8-inch laminated construction," and it is appellant's contention that, since it does not state whether the lumber to be used therein is to be green or dry, appellant could use either it saw fit, and still comply with the specifications.   This point is argued much as if the controversy arose between a contractor and an owner, appellant seeking to place itself in the position of a contractor who has constructed a building under plans which did not specify whether green or dry lumber was to be used, leaving the choice with the contractor.   It seems to us, however, that this is an attempt to cast respondent in a role which it never voluntarily assumed.   To determine what part it played in this situation, let us first consider the relationship of the parties, their needs and purposes.

The appellant was desirous of building a structure that would properly house the business of respondent. To that end, it would need to know the approximate amount of floor space, the general type of construction, the arrangement and character of floors required, the details, of course, being a matter of its own choosing.

The respondent, on the other hand, would care little about the building, except whether it had sufficient floor space, suitable arrangement, proper facilities and structural strength for its heavy machinery.

With this in mind, it will be seen that the provision in the specifications for "laminated construction" was not inserted, as far as respondent was concerned, for any other reason than that the floors should have sufficient strength to carry the load required, and detract from the fire risk. It was in no wise interested in the details of the laminated construction, whether the lumber therein to be used was green or dry, fir or hemlock, clear or No. 3 grade, so long as the floors were structurally sound. That was wholly a matter of concern to the appellant whose duty it was, under the lease, to furnish a structurally sound building for respondent's use.

The building belonged to appellant, while respondent was but a lessee for a ten-year period. The value to appellant, at the end of the ten-year period, would arise out of the care and skill with which it was constructed; the value to respondent would only be to the extent that it could be used for a limited space of time. Therefore it seems tolerably plain that the appellant, in no sense, stands in the position of a contractor erecting a building for respondent, but rather is one who has erected a building for itself, of a certain type and general character, fitted for another's needs, and which it has leased to that other. The same argument advanced by appellant, if sound, would hold good, if the portion of the building to be constructed of concrete had crumbled. Could appellant avoid liability by pointing to the specifications and reminding respondent that they did not specify the amount or kind of sand, gravel and cement? Surely not, for what respondent desired was construction of a certain char-

aćter, to wit: concrete. Its interest, in that regard, went no further than the type of construction;—to appellant was left the details thereof, so that, when finished, it would be durable and structurally sound.

With this view of the relationship of the parties and their duties toward each other, let us turn to the question of whether appellant failed in its duty to respondent.

Appellant has sought to excuse its use of green lumber upon the ground that such lumber was customarily used in laminated construction at the time this building was erected. The record discloses that several buildings of this type were constructed at or before the time this one was erected, and that dry rot had attacked the floors in many of them. Appellant therefore contends that, since the floors were constructed according to the prevailing custom, it should not be held liable. While it does appear from the evidence offered that a number of buildings were constructed in the same way, the evidence does not at all convince us that the use of green lumber in laminated construction was good practice. We think that the most that can be said for appellant's evidence in this regard, accepting it at its full face value, is that, at the time this building was constructed, its contractor and some others did not know that floors so laid would rot quickly, but that, in the light of the failure of this building and others, they realize now that it was not good practice. Our view of the evidence convinces us that there was sufficient knowledge available at the time of the construction of the building, both from other floors that had rotted, and from discussion among the builders and lumber men generally, to make the use of green lumber, at the very least, a questionable practice. There was testimony showing that the West Coast Association of Lumber Dealers, in its handbook

for the year 1916, a recognized authority on such mat-
ters, specifically advised the use of kiln dried lumber
in laminated construction.    Some of its provisions
were as follows:

"Laminated floor timbers should be thoroughly kiln
dried before being placed in the building to prevent dry
rot.

"The durability of a mill building may be greatly
increased by a few simple operations.    The decay of
wood, which is hastened by the presence of damp air
and poor ventilation, starts most readily on the end
grain of timbers such as girders and columns.    This
fact should be recognized and methods of construction
so modified as to prevent conditions favorable to decay.
Dry lumber should be used wherever possible and in
the construction of laminated floors all lumber should
be thoroughly kiln dried before being placed in the
structure.

"Girders or joints which rest in masonry walls
should not be sealed in.    An air space of at least two
inches should be provided all around the end to allow
proper ventilation.    Two brush applications of hot
coal-tar creosote, or other suitable preservative, will
assist materially in preventing decay.    Ends of girders
or joists should rest on cast iron plates or joist hangers,
and the bearing surface should be protected by a piece
of creosote saturated felt or asbestos."

Further:

"The above details are particularly necessary in
buildings which are unheated, and are desirable in all
buildings.    The ends of large girders and joists should
never be encased in such a way as to prevent seasoning
through the end surface.    Seasoning takes place more
rapidly through the end grain than from any other sur-
face, and seasoned timber is safe from dry rot just as
long as it is kept dry."

The portion of the above excerpts relating to the
encasement of the ends of girders is equally applicable
in this case, for the evidence is undisputed that the

ends of the lamination were encased in the concrete walls and that the rot there was very bad.

After carefully perusing the evidence, we are of the same opinion as the trial court, that the use of green lumber in floors of this character was improper construction.

[2] Appellant also claims that respondent waived any objection to the condition of the floors by accepting and occupying the building. Passing for the moment the claim of respondent that no waiver is pleaded, we are unable to agree that a tenant, by moving into a new structure, is estopped to claim damages by reason of latent defects. Respondent employed no superintendent or architect in connection with the construction of appellant's building. True, some of its representatives were from time to time at the scene of construction, but they were not there in any capacity which gave them control over the work. They were interested in the progress and in seeing that it was, in a general way, of the character they desired. It is not shown that respondent had any knowledge as to the kind of lumber that would be required in making the laminated floors, nor are any other facts shown by the record from which it can be inferred that respondent took occupancy of the building with knowledge that its floors were constructed of such material that, within three months, dry rot would be apparent, and that, within a very few years,—less than one-third of the life of the lease,—they would be unfit for use.

Certainly, where one takes possession of a new building under a ten-year lease, there is an implied guaranty that the building is so structurally sound that its main parts are good for the life of the lease. It may well be that portions of the roof which are exposed to the elements may develop some need for minor repairs, or that other parts may well need some slight re-

placements, but it is common knowledge that, in a large building of this character, floors are generally expected to, and do, last for upwards of twenty to forty years.   For us to say that appellant furnished a building properly constructed, when within three months there developed need of repairs on the floors thereof, not caused by any other reason than the failure to use the proper kind of materials to insure reasonable life, is to relieve the owner of the burden of furnishing to his lessee a reasonably structurally sound building. This we must not do.   *Shigata v. Gaffney Inv. Co.*, 72 Wash. 221, 130 Pac. 88.

If further evidence be required to establish the fact that there was no waiver, it may be found in a letter written to respondent by appellant suggesting an occupancy on April 12, 1923.   This letter was in part as follows:

"Your acceptance of this date as the time when your rental officially starts will, in no way, prevent you from holding us or the contractors accountable for any defects or omissions for which we or the contractors are responsible in the construction of your new building."

The judgment is affirmed.

MACKINTOSH, C. J., MAIN, FULLERTON, and HOLCOMB, JJ., concur.