[No. 21737. Department One. May 2, 1929.]

COMMERCIAL STATE BANK, *Respondent*, v. PALMERTON-
MOORE GRAIN COMPANY, INCORPORATED, *Defendant*,
FIDELITY & DEPOSIT COMPANY OF MARYLAND,
*Appellant*.[1]

[1]Reported in 277 Pac. 389.

90

*Williams & Cornelius,* and *O. C. Moore,* for appellant.

*Graves, Kizer & Graves,* for respondent.

TOLMAN, J.—This is an action to recover for failure to redeliver certain wheat stored with the defendant Palmerton-Moore Grain Company, Inc., and represented by its negotiable warehouse receipts duly issued therefor. The grain company having given a statutory warehouseman's bond, the surety on the bond is also made a party defendant.

A trial was had to the court, sitting without a jury, resulting in findings favorable to the plaintiff, and in a judgment thereon against both defendants for $4,000, the full penalty of the bond, and a further judgment against the grain company for $1,000 and interest, the amount of plaintiff's loss in excess of the penalty of the bond. Both defendants have appealed from that judgment.

The facts essential to an understanding of the questions raised are, briefly stated, substantially as follows:

The grain company was a licensed warehouseman, and, prior to the sale hereinafter mentioned, was the owner and operator of a number of grain warehouses in Whitman county, among them being two warehouses at Fletcher, a siding some three miles from the town of Oakesdale, where respondent had its place of business. By a written executory contract, dated February 3, 1927, the grain company agreed to sell these, or one of these, warehouses, to one, Fred C. Barron, an independent dealer in grain who had been for some time operating in that vicinity. At the time this contract was entered into, there was some 746 tons of grain in these warehouses for which the grain company's negotiable warehouse receipts were then outstanding.

The contract of sale makes no mention of the stored grain or outstanding receipts, and carries no provision looking to the release of the grain company from liability thereon or placing liability therefor upon Barron, but on February 10, 1927, the grain company wrote a letter to Barron, setting forth the terms upon which possession of the warehouses was delivered to him, and, thereafter, Barron, in writing, accepted the terms thus expressed. The writing is as follows:

"Spokane, Wash., February 10, 1927.
"Fred C. Barron
Oakesdale, Wash.
"Dear Sir:
"We confirm the following arrangement made with you on February 8 for taking over our Fletcher station, grain and storage of which copy hereto is attached.
"The understanding is that you are to take up our receipts by purchase or surrendered by others for loading out. You are to collect your storage and handling charges on our receipts when surrendered to you. You are to cancel said receipts covering sur-

render and forward same to Palmerton Moore Grain Co. at Spokane, Washington.

"The above arrangement is to carry until Palmerton Moore Grain Co. has received all warehouse receipts outstanding for said grain now in Fletcher warehouse, as per copy hereto attached which we guarantee to be on hands.

"Total tonnage as per outstanding receipts is 1,492,-066 lbs. or 746 tons and 66 lbs. Our storage and handling charges to February 1, 1927 amounts to $1,548.60. The loading out charges for above 746 tons at 15c per ton are $111.90. Balance due Palmerton Moore Grain Co. is $1,436.70, less the check received for $1,388.51. The present balance due our company is $48.19. Please sign and return the original.

"Subscribed hereto

"PALMERTON MOORE GRAIN Co.
"By H. E. PALMERTON.

"HEP: DM.          Sign          Fred C. Barron."

Thereafter the grain company paid no attention to these warehouses, exercised no control over Barron, and, until the latter became involved financially, seems not to have been greatly concerned about its outstanding receipts.

At the time of the sale and the taking possession by Barron, among the twelve or fifteen persons holding warehouse receipts of the grain company for grain previously deposited in these warehouses, was a farmer of the vicinity named Ellner, who held three receipts calling for upwards of 11,000 bushels of wheat.

Ellner had borrowed money of the respondent and pledged these receipts as collateral, and on May 12, 1927, Ellner sold these receipts to Barron, and apparently the whole transaction was completed in respondent's banking house. The receipts were obtained from respondent, the amount and grade of wheat called for by them ascertained, and its value determined at the

sale price agreed upon; and thereupon Barron borrowed from respondent $26,000, out of which he paid Ellner for the wheat represented by these certificates, and Ellner, in turn, apparently discharged his loan from respondent. Barron placed with respondent, as security for the loan to him of $26,000, these Ellner receipts properly endorsed by Ellner, and other like receipts which are not here in question.

When this loan was made by respondent to Barron, it seems to have been understood that Barron should clean up his wheat on hand, and market it at once, and retire the loan. Barron did ship out considerable wheat in the next few days, and, in each case where he shipped wheat which was pledged to respondent, he followed the usual custom of advising respondent that he was ready to ship that particular wheat, obtaining from it the warehouse receipts for surrender, so that the wheat could be loaded out, and immediately the wheat was loaded, returning to the bank, in lieu of the surrendered warehouse receipts, a bill of lading covering the wheat thus to be shipped, together with a draft attached to be paid by the person or concern to whom the wheat was shipped before it could obtain delivery, and the amount of the draft was, by respondent, immediately placed to Barron's credit. Shipments continued with frequency from the time this loan was made, May 12, to about May 19. During this interim, Barron asked respondent for the Ellner warehouse receipts, but respondent refused to deliver them to him, advising him that it would not deliver them until the wheat was ready to be shipped, and until it could be assured of receiving a bill of lading with draft representing the sales price according to the usual custom. These Ellner receipts were never surrendered by respondent or delivered to Barron, nor

was Barron ever authorized to ship any of the wheat which they represent.

About May 23, 1927, matters having occurred which rendered respondent suspicious, it charged to Barron's account in its bank the sum of $21,000 and credited that amount upon Barron's note for $26,000. This charge exhausted Barron's credit in the bank except for a small amount of $352.42.

Thereafter, and within a day or two, Barron absconded, and it developed that he had shipped out and sold all of the wheat covered by the Ellner warehouse receipts so held by the respondent. Other particulars will be mentioned as we proceed.

The first question raised involves the sustaining of a demurrer to one of the affirmative defenses, and the refusal to consolidate this action with other like actions for trial.

The second affirmative defense sets up that the penalty of the bond here involved is but $4,000; that two other holders of similar warehouse receipts are suing, one for $2,000, the other for nearly $4,000, and—

"That due to the facts herein alleged, the demands which are being made against this defendant on account of having executed said bond exceeds the penalty thereof and such demands so being made including that involved in this action is in excess of eleven thousand thirty-seven dollars and twenty-three cents, for which the liability of this defendant is not to exceed four thousand dollars ($4,000) and said McEachern and said Warwick are necessary and indispensable parties to this action to the end that the amount of the liability, if any, on the said bond should be determined, and the said liability, if any, should be proportioned and distributed according to the respective rights of the ones interested and who are entitled to resort thereto."

The rulings of the trial court upon this question were based upon the case of *Salo v. Pacific Coast*

*Casualty Co.*, 95 Wash. 109, 163 Pac. 384, L. R. A. 1917D 613. In that case a jitney bond was under consideration, and notwithstanding the words, "but the recovery against the surety shall be limited to the amount of the bond," were in the act providing for the bond, a majority of the court held that each person injured might recover to the full penalty of the bond. The *Salo* case, *supra,* was decided in February, 1917, and the warehouse act, under which this bond was given, was enacted two years later. In this later enactment, the words we have already quoted, which in the *Salo* case caused the court the most trouble, were omitted. The only other change we are able to discover is the substitution of the word "any" for the word "every", so that, while the jitney bond act reads "every person injured", etc., this act reads "any person injured", etc. [Rem. Comp. Stat., § 6982.] As used here, the words "any person" have as broad a meaning as the words "every person". 3 C. J. 249, § 8.

The legislature, in enacting the later law, is presumed to be informed of previous legislation and the construction which has been given to it by the courts. 2 Lewis' Sutherland Statutory Construction (2d ed.) § 499.

There is every reason why a warehouse bond should receive the same construction as a jitney bond, and therefore there was no error in the rulings of which we have just treated.

Appellants dwell exhaustively upon the facts as they see them from which they draw conclusions to the effect that respondent, by its acts, made Barron its agent to sell the wheat and must therefore bear the loss, or that respondent's acts were such that equity will not permit it to evade responsibility for the loss.

We shall not follow this argument because we are

amply satisfied that the evidence abundantly supports the findings of the trial court to a contrary effect.

It is next urged that, when the respondent charged Barron's account with $21,000 and credited that sum on his note, there remained to his credit $352.42, and later deposits were received amounting to $3,138.42, all of which should have likewise been applied upon the note.

It must be remembered that, at that time, respondent did not know that the wheat covered by the Ellner receipts, which it held as collateral to the Barron note, had been shipped out. It still held the receipts, and no doubt thought itself amply secured. All of this balance was at once drawn out on checks previously issued by Barron, and it may well be that the bank acted as it did in a spirit of fairness to others. At any rate, we cannot see that the appellants have any cause to complain in the absence of a showing of collusion between the respondent and Barron, of which there is none. *Carey v. Herrick,* 146 Wash. 283, 263 Pac. 190; 30 Cyc. 1251.

It seems to be urged that, in any event, Barron's acts amounted to theft and embezzlement, and were such that in no event would the grain company be responsible therefor.

We cannot follow this line of reasoning. The grain company, as a licensed warehouseman, had received this grain and issued its warehouse receipts therefor. The holders relied upon its receipts, as they had a right to do. We know of no rule of law which will permit the warehouseman to absolve himself from liability by giving possession of the stored grain to another without first obtaining the consent of the depositor, or afterwards obtaining his ratification or release. Holders of such receipts may, as against the acts of the warehouseman, rely thereon with con-

fidence that the warehouseman who issued them will do his full duty or respond in damages. Such a holder is not required to keep watch of the warehouse in which his grain is stored, or give ear to every rumor which may be afloat. If he believes the warehouseman's bond to be good, he may rest secure until he desires to sell his grain or, at least, for the period of one year named in the receipts, and thereafter until notified to surrender his receipt and accept the return of his grain.

This is not a case of theft in the ordinary sense, but a case in which the warehouseman surrendered the stored grain to one apparently unlicensed and unbonded, putting it in his power to wrongfully dispose of it and exercising no oversight to prevent his doing so.

Some argument is advanced to the effect that the liability in excess of the penalty of the bond cannot be enforced against the grain company, because this is an action on the bond only.

When a case has been fully tried out upon the merits, just results have been reached and no one has been deprived of a right to present a proper defense, this court is not inclined to reverse and require the same questions to be relitigated because some technical rule of pleading has been violated.

Here the cause of action is the statutory contractual obligation which rests upon the grain company by reason of its acceptance of the wheat and issuance of the warehouse receipts. The bond is also statutory and is collateral to the primary obligation. The action is based upon the primary obligation which the bond is given to secure and it seems to us that, at least, no prejudice has here resulted.

As said by Judge Dunbar in *Eureka Sandstone Co. v. Long,* 11 Wash. 161, 39 Pac. 446:

"We do not think there is any merit in the contention of the respondents, that there is a misjoinder of parties to this action. As was said by the Montana court in *Cockrill v. Davie*, 14 Mont. 131, 35 Pac. 958, the bond here was a collateral engraftment upon the contract which respondent Long had already given; and while the evidence which would tend to sustain this case against Long would differ from that which would sustain it against the sureties, it being in one case the contract and in the other the bond, the obligations of the parties and the rights of the plaintiff are identical. Under the bond and the contract it is the primary duty of the defendants to pay for this material. The bond and the contract are provided by statute for the express purpose of securing persons who furnish material or labor; and the right of the plaintiff in this case is the same as to all the defendants, and the testimony can be as logically and consistently brought out in one case as in two."

See, also, *Spokane County v. Prescott*, 19 Wash. 418, 53 Pac. 661, 67 Am. St. 733.

The complaint alleges the value of wheat represented by the warehouse receipts to be $14,500. The answer denies "that the value of said wheat was $14,500", but entirely fails to deny that its value did not exceed the amount of respondent's claim. Through oversight, probably, no proof of value was introduced, but the court found the wheat to be of the value alleged.

It is now urged that the judgment must be reversed because of the lack of proof in this respect.

Of course, everybody knows that at no time during the period covered by these transactions has such wheat as is described in these receipts had a market value of less than the amount here involved. The courts will not take judicial notice of values ordinarily, but in the light of the form of the denial and the lack of a real issue on the question, it would be absurd to hold that the trial court, aided by what is com-

mon knowledge, might not judicially know that 11,211 bushels of wheat was worth at least $5,000, and that is as far as his finding needed to go. *Centralia Labor Temple Ass'n. v. O'Day*, 139 Wash. 331, 246 Pac. 930.

We find no reversible error, and the judgment is therefore affirmed.

MITCHELL, C. J., HOLCOMB, and BEALS, JJ., concur.