[No. 32300.   *En Banc.*   April 23, 1954.]

E. M. McFERRAN, *Appellant,* v. EARL HEROUX *et al., Respondents and Cross-appellants.*[1]

[1]Reported in 269 P. (2d) 815.

*P. R. McIntosh* and *W. S. Lewis,* for appellant.

*Reischling & Chan,* for respondents and cross-appellants.

FINLEY, J.—The grandstand at Aurora Stadium Speedway, north of Seattle, in King county, Washington, was destroyed by fire on the night of December 31, 1950. E. M. McFerran, the lessor of the premises on which the grandstand was located, brought this action against his lessees and the latter's assignees to recover damages sustained by reason of defendants' failure to comply with provisions of the lease requiring a rebuilding of the grandstand. The lessee is Earl J. Heroux, and his assignees are Carl D. Payne and Bob Murray.

The grandstand in question was built in the early part of 1930, at a time when the premises were used as a dog-racing track. Dog racing was later discontinued. In 1941, Heroux came into possession of the premises by virtue of a lease from Elsie Huntoon, the then owner. The grandstand was then the property of the Peterson Wrecking Company. Heroux purchased the grandstand from this company for twenty-five hundred dollars. Thereafter, Heroux and McFerran, acting independently of each other, sought to purchase the real property in question from Elsie Huntoon. After considerable negotiations and some litigation, certain conflicting claims of Heroux and McFerran were compromised. It was agreed that McFerran would purchase the real property and lease it to Heroux. Because

of the compromise, the resulting lease contained several somewhat unique provisions.

The lease (executed on May 7, 1946) is for a period of ten years (from January 1, 1946, to December 31, 1955). No rental payments were stipulated, it being recited that the consideration would consist of the payment of taxes by the lessee and his fulfillment of the covenants and agreements of the lease. Under the lease, the grandstand and all other buildings and improvements then on the premises were classified as personal property; the lessee's ownership thereof was acknowledged, and it was agreed that the lessee had no duty to repair such buildings. There is no provision in the lease requiring the lessee to maintain fire insurance on the buildings, and no provision restraining assignment of the lease.

The suit before us revolves principally around the effect to be given to provisions of the lease which gave the lessor an option to purchase "all buildings and improvements owned by the lessee" for the rather nominal sum of five thousand dollars, upon notification of intention to purchase not later than six months before termination of the lease. The option rights appear to have been a significant part of the consideration for the lease and, apparently in part at least, account for the fact that no rent was to be charged the lessee. The pertinent language of the lease reads as follows:

". . . It is further agreed that should the lessor desire, he may at the expiration of the lease period, purchase all buildings and improvements owned by the lessee for the sum of $5,000.00 . . . Lessor will notify lessee of his intention to purchase the aforementioned buildings and improvements not later than six months before expiration of lease date and tender of the full amount of $5,000.00 will be made to lessee at that time. Should lessor elect not to buy, Lessee shall have 120 days after expiration of lease date in which to remove his personal possessions and in which to vacate premises . . .

"In the event of fire damage to the demised premises amounting to more than $500.00, Lessee shall have the option for a period of 30 days to either rebuild or surrender this lease and vacate the premises. Such option shall be

exercised by notice in writing to the Lessor within said 30 days. . . . If Lessee elects to rebuild, then he shall proceed without unnecessary delay in said rebuilding."

After execution of the lease, Heroux expended from eight to ten thousand dollars repairing and strengthening the grandstand. It was a covered wooden structure with a seating capacity of twenty-five hundred. It had indoor lavatories, offices, club rooms, restaurant facilities, and storage space.

Heroux, although not obligated by the lease to insure the grandstand, nevertheless did so, and, after the fire, he collected sixty thousand dollars in fire insurance. He elected to rebuild the grandstand, and he so notified McFerran in writing within thirty days after the fire, as required under the terms of the lease. A cleanup of the premises was undertaken immediately after the fire. However, before any reconstruction was commenced, Heroux assigned his interest in the lease to Carl D. Payne and Bob Murray.

Payne and Murray then erected two uncovered spectator stands. One had a seating capacity of twenty-five hundred. The other accommodated twelve hundred. About half of the seats were removable. Payne and Murray also built a separate structure about sixty feet behind these new stands, in which lavatories, concessions, and storage rooms were located. This building was about two hundred feet long and twenty feet wide, and made use of the water pipes and sewer connections of the original grandstand. About twenty-five thousand dollars (approximately one fourth of the estimated cost of rebuilding the destroyed grandstand) was expended in erecting the new stands and building just described.

On April 3, 1951, McFerran began this action. The theory advanced in his complaint is that the construction of the uncovered stands and the additional building did not constitute a rebuilding of the grandstand within the meaning of the lease. Alleging that Heroux, Payne, and Murray had declared their intention not to rebuild the grandstand,

plaintiff McFerran asked for damages in the sum of ninety-five thousand dollars.

The cause was tried without a jury. Evidence was introduced tending to show, and the court found, that the cost of rebuilding the grandstand immediately after its destruction would have been $103,633.66. No evidence was introduced and no finding was made as to the depreciation which would have occurred between the time of such rebuilding and the termination of the lease on December 31, 1955. There was no allegation, evidence, or finding to the effect that plaintiff had notified defendants of his intention to purchase the grandstand, or the newly built structures replacing it, at the expiration of the lease; or had tendered the five-thousand-dollar purchase price, as provided in the lease; or that plaintiff would have exercised his option to purchase but for the failure of Heroux and his assignees to rebuild the destroyed grandstand.

The trial court found that the new structures were not reproductions of the destroyed grandstand and were of less value, and concluded that there was a breach of the covenant to rebuild. However, the court concluded that the measure of damages was the present value of plaintiff's future right to exercise his option "to purchase something which may not be in existence at the expiration of the lease;" furthermore, that there was no evidence as to the value of McFerran's future right to exercise his option, and that the matter of damages was purely speculative. Plaintiff was awarded nominal damages in the sum of one dollar. This appeal followed, plaintiff contending that a substantial judgment should have been entered in his favor. Defendants cross-appealed, contending that the trial court erred in finding that they had not substantially complied with the rebuilding requirement of the lease. Inasmuch as both parties have appealed, we will continue to refer to them as plaintiff and defendants.

This is a complex case. It requires a rather close analysis of the nature of an option contract.

Plaintiff's action is based upon allegations of a present and substantial breach of provisions of the lease contract, in

which (1) the plaintiff leased certain premises to the defendant Heroux; (2) in part consideration therefor, the defendant agreed to sell to the plaintiff, at the end of the ten-year lease term, all improvements upon the premises (which, under the lease, were deemed his ·personal property) for the comparatively nominal sum of five thousand dollars; and (3) defendant Heroux covenanted that, in the event of destruction of the improvements by the fire, he would (a) either surrender the lease *or* (b) rebuild the improvements within a reasonable time.

When, after the fire, Heroux gave written notice of his election to rebuild, the disjunctive covenants to surrender the lease *or* to rebuild became an absolute covenant to rebuild. Thereupon, defendants Payne and Murray, who were assignees of Heroux and were bound by his covenants, as stated above, proceeded to construct the new spectator stands, expending thereon some twenty-five thousand dollars. As mentioned above,·defendants in their cross-appeal contend that they have fulfilled their obligation to rebuild. Among other things, they point out that the new stands have a greater seating capacity; however, plaintiff-lessor contends that the structures are in other respects inferior to and quite unlike the original grandstand.

Although the defendants were not obliged to produce an exact replica of the original structure, they were obligated to build a new structure or structures reasonably similar in kind and proportions to the original construction. *Seattle v. Northern Pac. R. Co.,* 12 Wn. (2d) 247, 121 P. (2d) 382. The trial court did not err in finding that defendants' failure to rebuild was a substantial breach of the lease. Although the failure to rebuild was a breach of a present duty and provided a basis for legal proceedings to terminate the lease and to evict the tenant, nonetheless it is apparent that the plaintiff is much more interested in the breach in so far as it presently interferes with his option rights to purchase a grandstand, rebuilt substantially the same as the one that burned.

It has ·been suggested that this action was brought prematurely because, until the optionee exercises his option,

he has no present rights in the grandstand which is the subject matter of the option. It is true that plaintiff does not presently have a *contract of purchase.* But to infer that, until an option has been exercised, the optionee has no rights of any kind capable of being enforced, is to ignore the contractual nature of the option itself. In *Whitworth v. Enitai Lbr. Co.,* 36 Wn. (2d) 767, 220 P. (2d) 328, we defined an option as follows:

"An option to purchase property is a contract wherein the owner, in return for a valuable consideration, agrees with another person that the latter shall have the privilege of buying the property within a specified time upon the terms and conditions expressed in the option. . . . when supported by a consideration, as in the case at bar, the execution of the agreement results in a contract binding upon the optionor which may not be withdrawn by him during the time set forth therein."

1 Corbin on Contracts 907, § 272, contains the following pertinent passage:

"As has heretofore been stated, the holder of an option to buy land has a conditional right to a conveyance, a power to turn that right into an unconditional right to immediate conveyance by performing the conditions, an immunity from revocation by the option giver, and the legal privilege of performing or not performing the conditions at his option. During the agreed term of his option, *he has a right that the option giver shall not repudiate or make performance impossible or more difficult* by conveying the land to a third person. *These rights are enforcible by all the usual judicial remedies, including judgment for damages,* injunction, and decree for specific performance. It is beyond question that those who have bought and paid for an option on the land believe that they have something on which they can rely; they make contracts for the resale of the land, often make valuable improvements on it, and make other important changes of position, as evidence of such reliance." (Italics ours.)

In James on Option Contracts 504, § 1104, it is said:

"The nature of a mere *offer* seems logically to lead to the conclusion that the offeree, in the absence of a timely acceptance of the offer, acquires no right which may be the foundation of a cause of action against the offerer, based

upon a withdrawal of the offer, by the latter, prior to acceptance; *but an option,* as we have seen, *is the sale of the right of election to purchase.* It is recognized as a property right which, even prior to election, may be the subject of bargain and sale. The optionor expressly or impliedly stipulates not to withdraw the offer of sale during the time limit, and, therefore, *if during the time limit he breaches the option agreement by repudiating the option, or by placing himself in a position where it is impossible for him to perform, it would seem the optionee has an action to recover damages arising from breach of the option, although he has not elected."* (Italics ours.)

In the instant case, defendants' failure to rebuild within a reasonable time, and their words and acts unconditionally disclaiming their legal obligation to rebuild, has deprived plaintiff of his option to purchase at a future time the grandstand, reconstructed as it was at the time of the fire. Legally, the effect of this conduct of the defendants is no different than if the improvements subject to the option had been sold to a third person. In either case, the plaintiff should be able to recover damages for the loss of his option contract.

In James on Option Contracts 505, § 1104 (Annotation 3), that author comments on the necessity of election prior to bringing action for a breach by the optionor:

"It would seem the breach of an option contract to keep the offer open during the stipulated time does not differ in principle from the breach of any other contract, and that, therefore, if during the time limit, the optionor breaches, as by selling the property to a third person under circumstances showing a repudiation of the option, *the idle and useless act of electing is not necessary to entitle the optionor to sue and recover damages for such breach, if an action is brought,* or if, as in the Guilford case, some act is done by the optionee, *before the expiration of the option time limit, to show his intention to enforce the option."* (Italics ours.)

Under the terms of the lease, the plaintiff was required to tender five thousand dollars at the same time he gave notice of his election to purchase. However, as a consequence of the defendants' breach, the subject matter of the option did not even exist. In the face of these facts, it is

difficult to imagine any reason for requiring the "idle and useless act of electing" as a condition for bringing this action.

■ It may be thought that the optionee can show no damage to his option rights unless he has alleged that he was willing and able to exercise the option but for the defendants' breach. The bringing of the action prior to the expiration of the option is the best evidence of the plaintiff's intention and willingness to enforce the only rights remaining to him, namely, the remedial rights given by law. It would appear to be overly technical to seize upon the plaintiff's failure to *allege* a willingness to exercise the option but for the breach, and thereby bar his recovery, while ignoring the *evidence* that, under the contract, the plaintiff had the right to purchase for five thousand dollars improvements which would cost over one hundred thousand dollars to build.

■ So far as the optionee's financial ability is concerned, we have held that, where an optionor has breached his option contract, he has the burden of proving the optionee's lack of ability, and, in the absence of such proof, there is a presumption that the optionee is able to perform. *Palmer v. Clark,* 52 Wash. 345, 100 Pac. 749.

■ Plaintiff's action is not premature merely because his option entitled him to secure possession of the grandstand in 1955. This court has held on numerous occasions that, where a party to a contract repudiates the contract, either by a positive refusal to perform before performance is due or by putting it out of his power to perform, an action for damages brought immediately is not premature. *Casey v. Murphy,* 143 Wash. 17, 253 Pac. 1078; *Hunter v. Wenatchee Land Co.,* 50 Wash. 438, 97 Pac. 494.

The theory which permits a plaintiff to sue immediately in a case of this kind is sometimes said to be anticipatory breach. But strictly speaking, the action is for a *present breach, seeking recovery for future damages.* This true basis for the action is stated with unusual clarity in 5 Williston on Contracts 3714, § 1317, as follows:

"Again, it is often thought that to allow a plaintiff to sue and recover full damages after some performance by the defendant has become due, but before the time for the completion of all his performance is to allow the doctrine of *anticipatory breach, yet this is not the case. As soon as a party to a contract breaks any promise he has made, he is liable to an action.* In such an action the plaintiff will recover whatever damages the breach has caused. . . . if the breach is serious or is accompanied by repudiation of the whole contract, it may and frequently will involve as a consequence that all the rest of the contract will not be carried out. This may be a necessary consequence of the situation of affairs or it may result simply from the plaintiff's right to decline to let the defendant continue performance, since even if all the remaining performances were properly rendered, the plaintiff would not get substantially what he bargained for. The plaintiff is entitled to damages which will compensate him for all the consequences which naturally follow the breach, and, therefore, to damages for the loss of the entire contract. This is no different in principle from allowing a plaintiff in an action of tort for personal injuries to recover the damages he will probably suffer in the future. *If the cause of action has accrued, the fact that the damages or all of them have not yet been suffered is no bar in any form of action to the recovery of damages estimated on the basis of full compensation.*" (Italics ours.)

■ There may be some curiosity as to why the plaintiff *elected* to pursue the remedy of damages for breach of the option rather than to terminate the lease and evict the tenant, when, as a practical matter, the latter appeared the simple and obvious thing to do, since the new buildings erected by the tenant were unsatisfactory to the plaintiff and seemed to him *not to constitute* substantial performance of the terms of the lease. The answer is that the plaintiff had the right to elect as to which of two remedies he would pursue. He chose not to terminate the lease, but to continue it, and to sue for the loss of the option right which was a major part of the consideration for the lease. This he had a right to do.

The question may be asked as to whether the plaintiff, after the recovery of damages, has any claim or option

rights relative to the buildings which the defendants erected in lieu of reconstructing or duplicating the old grandstand building as it existed at the time of the fire. The answer is that plaintiff has no claim or option rights as to the new stands erected by the lessees.

■ The plaintiff, in bringing this action, has requested damages to compensate him for his loss, which was caused by the defendants' breach. An award of damages is compensation in money as a *substitute* for the promised performance. 5 Corbin on Contracts 3, § 990. In the eyes of the law, the recovery of damages makes a plaintiff whole for loss or injury suffered. Since the remedial right to damages is a substitute for the plaintiff's contract rights, a recovery by the plaintiff in the instant action would discharge the defendants' contractual duty to sell, at the end of the lease term, the newly constructed building and spectator stands placed on the premises as substitutes for the destroyed grandstand.

■ Under the lease, plaintiff had the right to purchase the original grandstand, or, in case of its destruction, a rebuilt grandstand. Since the grandstand was not *rebuilt*, within the meaning of that term, the plaintiff is not obliged to accept something else in lieu of what he had bargained for. There was not substantial compliance by the defendants. Accordingly, plaintiff should recover damages for the full amount of his loss and the defendants are not entitled to a set-off for the value of the buildings they erected. Those buildings remain the personal property of the defendants.

■ The only remaining question concerns the amount of damages. As indicated heretofore, the damages which plaintiff has suffered or will suffer result from the loss of his option and not from loss of a *contract of purchase*. This theoretical distinction is discussed in James on Option Contracts 506, § 1104, as follows:

"It will be observed that as an option, prior to election, is not a sale, or an agreement to sell the land, the measure of damages is not the difference between the contract price and the market value of the land, the rule obtaining where the optionee has elected, *but the damages recoverable are limited*

*to those resulting from breach of the option contract itself,* which, however, may be the excess of the market value of the land over the option price, or depending on the facts, the difference between the option price and the price at which the optionee has contracted to resell the optioned property." (Italics ours.)

Stated simply, the plaintiff is entitled to recover as damages the value of the option contract. *Sixta v. Ontonagon Valley Land Co.*, 157 Wis. 293, 147 N. W. 1042. In the case of options to purchase land, the surest measure of this value may be, as stated by James, "the excess of the market value of the land over the option price." In the instant case, however, such a measure would be wholly inadequate to compensate the plaintiff for his loss. The subject matter of the option is the grandstand which defendants were bound to rebuild on land owned by the plaintiff. The price which this structure, separate from the land, would bring on the open market might be limited to its salvage or wrecking value. At any rate, market value of the grandstand would be substantially less than its worth to the plaintiff, as owner of the land (and race track) on which the grandstand was located, or should have been rebuilt by defendants. In view of this circumstance, the cost of rebuilding the grandstand, pursuant to defendants' covenant (less deductions hereafter mentioned), appears to be the most accurate available basis for determining the value of the option contract.

It may be noted that in an analogous situation, where a lessee has breached his covenant to keep leased premises in a particular state of repair, the measure of damages is the reasonable cost of putting them in that condition, and not their market value. *Yakima Valley Motors v. Webb Tractor & Equipment Co.*, 14 Wn. (2d) 468, 128 P. (2d) 507; *DeLano v. Tennent*, 138 Wash. 39, 244 Pac. 273, 45 A. L. R. 766.

The plaintiff produced evidence that it would have cost $103,633.66 to rebuild the grandstand shortly after the fire which occurred on December 31, 1950. It was then that defendants were bound by their covenant to rebuild. However, the option right which plaintiff lost was the right to obtain possession of the rebuilt structure at a future time,

*i.e.*, December 31, 1955, when the lease terminates. In ascertaining the value of this right, it is necessary to compute and to deduct depreciation (for the five years from December 31, 1950, to December 31, 1955) from the cost of rebuilding, and then subtract the option price of five thousand dollars. Finally, the resulting amount should be discounted to find its cash value at the time final judgment is entered.

. The plaintiff did not produce any direct evidence as to the proper rate of depreciation. In the absence of such proof, we are faced with the alternatives of (1) giving nominal damages (which would in effect treat the useful life of a grandstand which would cost $103,633.66 as being five years), or (2) taking judicial notice of a reasonable rate of depreciation for a structure of this kind.

On the matter of judicial notice, it is stated in the Model Code of Evidence by the American Law Institute 320, Rule 802:

"The judge may of his own motion take judicial notice of
" . . .
"(b) specific facts so notorious as not to be the subject of reasonable dispute, and
"(c) specific facts and propositions of generalized knowledge which are capable of immediate and accurate demonstration by resort to easily accessible sources of undisputable accuracy, . . ."

Within the purview of subparagraph (b) above, this court, in *Black, Inc., v. Crescent Mfg. Co.*, 146 Wash. 119, 262 Pac. 125, held that:

"It is common knowledge that, in a large building of this character, floors are generally expected to, and do, last for upwards of twenty to forty years."

In *Commercial State Bank v. Palmerton-Moore Grain Co.*, 152 Wash. 89, 277 Pac. 389, where the plaintiff sought to recover the value of wheat but failed to prove its value, we said:

"Of course, everybody knows that at no time during the period covered by these transactions has such wheat as is described in these receipts had a market value of less than the amount here involved. The courts will not take judicial notice of values ordinarily, but in the light of the form of

the denial and the lack of a real issue on the question, it would be absurd to hold that the trial court, aided by what is common knowledge, might not judicially know that 11,-211 bushels of wheat was worth at least $5,000, and that is as far as his finding needed to go."

Within the scope of subparagraph (c) of the Model Code of Evidence, *supra*, this court has on numerous occasions taken judicial notice of standard mortality tables for computing the average life expectancy of persons of particular ages. *Cox v. Polson Logging Co.*, 18 Wn. (2d) 49, 138 P. (2d) 169; *Piland v. Yakima Motor Coach Co.*, 162 Wash. 456, 298 Pac. 419; *Roalsen v. Oregon Stevedoring Co.*, 147 Wash. 672, 267 Pac. 433; *Heath v. Stephens*, 144 Wash. 440, 258 Pac. 321.

In the instant case, the plaintiff has proved the basis for his damages but has failed to produce any expert witness to state an opinion as to the proper rate of depreciation for the particular type of structure. This is not to say there was no evidence from which a proper rate of depreciation could be determined. The record discloses the pertinent information that the structure, which should have been constructed, would have been a wooden grandstand, costing $103,633.66 to build. The original grandstand (which the defendants were bound to rebuild) was built on cement blocks and was constructed of 12x12 timbers, running from the ground through to the beams at the top. The timber girders were reinforced with bolts and steel in truss form.

In consideration of the evidence before us regarding the substantial character of the structure, we judicially notice that the useful life for wooden grandstands, listed in the "U. S. Treasury Department—Bureau of Internal Revenue, Bulletin 'F' (Revised January 1942), Income Tax Depreciation and Obsolescence Estimated Useful Lives and Depreciation Rates," is fifteen years. This figure is, of course, an average, just as are those found in the standard mortality tables. But in view of the evidence reviewed above, the figure is undoubtedly a conservative one.

A fifteen-year useful life gives a depreciation of one third for the five-year period from breach to the time plaintiff

could have gotten possession. The $103,633.66 cost of the re-building, less one third for depreciation, is $69,089.11. From this amount must be deducted the option price of $5,000, leaving $64,089.11, as the amount due on December 31, 1955. This sum should be discounted to find its value at the time judgment is entered therefor.

The plaintiff offered no evidence as to the proper interest rate for discounting this sum. Accordingly, he should have judgment for the amount of $64,089.11, to be discounted at the legal rate of interest at six per cent, computed as of the date the trial court enters judgment on the remittitur of the record.

ALL CONCUR.

September 27, 1954. Petition for rehearing denied.

[1]Reported in 269 P. (2d) 806.