CORINTHIAN CORPORATION, *Respondent*, v. WHITE & BOLLARD, INC., *et al., Appellants.**

*Preston, Thorgrimson, Horowitz, Starin & Ellis,* by *Edward Starin* and *Charles Horowitz,* for appellant White & Bollard, Inc.

*Holman, Marion, Perkins, Coie & Stone, Burroughs B. Anderson* and *Richard R. Albercht,* for appellant Corley Mortgage Company, Inc.

*Rauscher, O'Connor & Kiefer,* for respondent.

WEAVER, J.—This action stemming from a transaction in 1957 involves three Washington corporations: (1) Corinthian Corporation (plaintiff-respondent); (2) White &

*Reported in 442 P.2d 950.

Bollard, Inc., (defendant-appellant);[1] and (3) Corley Mortgage Co., Inc., (defendant-appellant and cross-appellant). We refer to the parties as Corinthian, W & B, and Corley.

This complex[2] controversy orbits around the nature, interpretation, application, and alleged breach of a written agreement, entitled "Option Agreement," dated June 19, 1957, entered into by Corinthian and W & B.

## NATURE OF THE CASE

In general, this is an action by Corinthian against W & B and Corley for damages for the alleged breach of the written agreement dated June 19, 1957. In addition, certain additional relief, which will be identified later in this opinion, is sought.

Of the 87 assignments of error, approximately 40 are directed to findings of fact or to requested findings of fact; almost 40 are directed to conclusions of law or to requested conclusions of law. Obviously, it is impractical to consider them seriatim or even in various categories, for they cover almost every facet of a complicated transaction and an accounting extending over an 8-year period.

After a review of the extensive record, we find that it supports the facts as we set them forth.

## FACTS

In 1957, Corinthian was the owner[3] of the right to ac-

---

[1] In 1961, the Commerce Mortgage Co., Inc., was organized and acquired the assets and business of White & Bollard, Inc. Following the transfer of the assets, White & Bollard, Inc., was dissolved. Corinthian consented to assignment of the option agreement of June 19, 1957. Subsequent to dissolution, Commerce Mortgage Co., Inc., changed its name to White & Bollard, Inc. The second White & Bollard, Inc., is the present defendant. We do not find it necessary to make a distinction between the two corporations, for the second assumed the obligations of the first under the option agreement of June 19, 1957.

[2] The complexity arises from the following: (a) a transcript of 508 pages; (b) 10 volumes of a statement of facts totaling 1,573 pages; (c) approximately 140 exhibits; and (d) 340 pages of appellate briefs. Cross-claims of defendants further complicate the action.

[3] Ownership is used in its broad sense. Corinthian owned a contract, dated June 20, 1956, from Northwestern Improvement Co. as to one parcel of land; and a real estate contract and purchaser's assignment, dated June 8, 1956, as to the other parcel. No question of Corinthian's title is involved in the instant case.

quire approximately 570 acres of land located in King County, east of Lake Washington, between the cities of Bellevue and Renton. The area is now known as Newport Hills. The land was unimproved, undeveloped, and unplatted.

The ultimate objective of the transaction between Corinthian and W & B was to develop this land into a residential area with ancillary facilities. Corinthian owned the land; W & B had the capacity to effect the development. It had the "know-how"; an engineering department, a sales organization, an established relationship with home builders, the construction-financing facilities, and a residential mortgage department.

AGREEMENT OF JUNE 19, 1957

June 19, 1957, Corinthian and W & B entered into an 8-page agreement entitled "Option Agreement." We believe it is significant that the words "option," "optionor," and "optionee" are used in the instrument more than 100 times. The words "buyer," "seller," "vendor," or "vendee" are not used.

■ An option to purchase property is a contract wherein the owner, in return for a valuable consideration, agrees with another person that the latter shall have the *privilege* of buying the property *within a specified time upon the terms and conditions expressed in the option.* McFerran v. Heroux, 44 Wn.2d 631, 638, 269 P.2d 815 (1954), and authorities cited.

Since the written agreement of June 19, 1957, is the nucleus of this controversy, we find it necessary to set forth its salient provisions, numbered as they appear in the agreement.

The "whereas" clause is this:

Optionee [W & B] has requested Optionor to grant an option to purchase certain real property of Optionor [Corinthian], and Optionor is willing to grant such option on the terms hereinafter provided . . . .

The "granting" clause is this:

(1) Optionor grants to Optionee the option to purchase

as hereafter set forth certain real estate in King County, Washington, described as follows: [Parcel A and Parcel B].

(2) For the sake of brevity we paraphrase the recited consideration. During the existence of the agreement, W & B agreed to pay all of the real estate taxes on Parcels "A" and "B," although it would own only that part of the property upon which it had exercised its option and had received a deed; and to pay the interest accruing upon Corinthian's contractual rights in its acquisition of all of the land (see note 3, *supra*). Paragraph 5 of the option agreement acknowledges that the taxes and interest to be paid were the consideration for the option. W & B was to advance the amount of any real estate sales tax which may apply to any purchase under the agreement, the tax to be repaid by Corinthian by crediting W & B with the amount thereof at the time the purchase price becomes due from W & B.

(3) W & B was granted the option to purchase the land in 40-acre parcels; in Parcel "A" the 40 acres had to be a governmental subdivision. After designation of the first 40-acre parcel, subsequent options had to be of a 40-acre tract adjoining a tract previously conveyed to W & B.

(4) Execution of the agreement constituted the exercise by W & B of its option to purchase the first 40-acre parcel, and Corinthian was bound to deed it to W & B.

(5) The purchase price per acre for the total land purchased *by exercise of options hereunder up to termination of this agreement* shall be $2,000.00 per acre, increased by 50% of the net profit realized by Optionee [W & B] with respect to property purchased and resold hereunder to the extent hereafter provided. (Italics ours.)

The method of payment may be "old-hat" to an expert in real estate transactions or to an expert accountant; but, as set forth in the option agreement, it is a "wonderful and fearful thing" for an appellate court called upon to consider the record.

The contractual plan of payment by W & B to Corinthian was completely deferred. W & B was to pay $1,200 per acre for the first 40 acres, payable on or before July 1, 1958; $1,400 on the second 40 acres upon which it exercised its option; $1,600 per acre for the third 40 acres; $1,800 for the fourth 40 acres; $2,199.50 per acre for each additional parcel upon which it exercised its option. W & B did not have to pay the basic purchase price of each 40-acre parcel, other than the first, until March 5 following the exercise of the option.

Thus, it would seem that Corinthian would not receive its basic sales price of $2,000 per acre until W & B had optioned and had paid for the last parcel in the tract. This, however, is subject to adjustment should the agreement be cancelled by either Corinthian or W & B.

In addition, however, Corinthian was to be entitled to 50 per cent of the net profit realized by W & B upon its resale of lots in each parcel. It is not necessary that we set forth the method of determining W & B's net profit. The first accounting of "net profit" was to be made after W & B's purchase and resale of 200 acres; the second accounting after purchase and sale of the second 200 acres; and a final accounting after a purchase and resale of the remainder. This, however, is subject to adjustment should the agreement be cancelled by either Corinthian or W & B.

(6) W & B could not exercise an option until it had paid Corinthian the basic price of the land involved in previous options it had exercised.

(7) Upon receipt of written notice designating the parcel of land, Corinthian must forthwith deliver a deed to W & B.

(8) This is one of the paragraphs upon which the trial court placed great emphasis in support of its conclusion. We quote the pertinent portions.

> Optionee [W & B] agrees to exercise at least one option during each calendar year of the existence of this agreement, commencing with 1957. Optionee agrees to exercise options covering all of parcels "A" and "B" above within seven and one-half years from the date of this agreement. . . . In the event any option is not

exercised by Optionee by the date required hereunder, Optionor [Corinthian] shall have the right to cancel this agreement, provided, however, that Optionee, [W & B] on written notification to Optionor, shall have the right to extend the time for exercise of one option for a period of six months.

(9) Optionee [W & B] agrees to pay before delinquency all assessments levied or becoming due against the property described in paragraph 1, provided, however, that if this agreement is terminated, Optionor [Corinthian] shall thereupon reimburse Optionee [W & B] for the amount of assessments previously paid by Optionee [W & B] which are allocable to property not purchased by Optionee.

(10) This paragraph of the agreement has no application to the instant case.

(11) Optionee [W & B] agrees to diligently pursue the development and resale of property purchased under this agreement and Optionee further agrees *not* to undertake any other major development until 75% completion of the development contemplated by Optionee [W & B] with respect to the property subject to this agreement. (Italics ours.)

Paragraphs 12, 13, 14, 15 and 16 have no bearing upon this litigation.

(17) Time is of the essence of this agreement. If Optionee shall fail to exercise any option or make any payment promptly at the time the same shall become due, or promptly perform any covenant, agreement or obligation hereunder, Optionor may elect to cancel this agreement by notice in writing and thereupon all rights of Optionee hereunder shall cease and any payments theretofore made shall be retained by Optionor as liquidated damages, provided, however, that Optionee shall not be relieved of paying $2,000.00 per acre due or to become due with respect to land previously purchased, including 50% of the net profit realized therefrom, nor shall Optionee be relieved of the obligation to pay interest accrued to the date of cancellation and real estate taxes due on a pro rata basis at the date of cancellation. . . . In the event of any default, Optionor may bring an action for recovery of any amounts due from Optionee. Any action for the recovery of money shall be considered as if the

promise to pay had been expressed in a different instrument, and no such action shall constitute an election not to proceed otherwise as to any subsequent or continuing default, and no waiver by the Optionor of any default on the part of Optionee shall be construed as a waiver of any subsequent or continuing default.

(18) Optionee shall have the right to cancel this agreement by giving Optionor sixty days' advance notice in writing and paying Optionor $2,000.00 per acre with respect to all options theretofore exercised, less all moneys previously paid by Optionee for such acreage, excluding percentage of net profit, if any, previously paid. In the event of such cancellation, the rights of the parties shall be terminated except that Optionee shall pay any interest which may have accrued as herein agreed up to the date of cancellation, together with real estate taxes due on a pro rata basis at the date of cancellation.

(19) In any suit or action to enforce any provision of this agreement or to collect any payment or any charge arising therefrom, Optionee agrees to pay a reasonable sum as attorneys' fees together with costs and disbursements in connection with such action, including the reasonable cost of searching records.

Subsequent to the execution of the option agreement, Corinthian and W & B agreed that it would be beneficial in the development of Newport Hills to build recreational facilities for those building homes. This was done at a total cost of $169,632.18, and borne equally. By reason of later developments, the trial court found it necessary to adjust the cost of these facilities to Corinthian.

In September, 1962, W & B acquired approximately 100 acres of land from other owners, and developed it along with land acquired from Corinthian, using the same organization to develop and sell lots and homes in the two neighboring developments. It used the same advertising, sewer facilities, roads to service the two developments generally, and the recreational facilities (to which we have alluded). Corinthian objected to this, but to no avail.

The trial court found that the additional land was a "major development" which breached paragraph (11) *supra,* of the option agreement. W & B had not exercised its

option to purchase 75 per cent of Corinthian's land. We agree.

In 1963 and early 1964, W & B terminated its engineering staff; ceased clearing of land, installing of utilities, and engineering work. It curtailed its builders-financing program. By June 29, 1964, W & B had, for all practical purposes, ceased its efforts to develop and resell the property. About July 1, 1964, it disbanded its sales force.

With Corinthian's knowledge but strenuous objection, W & B, in July, 1964, sold to Corley its remaining real property (developed, partly developed, and undeveloped) previously acquired from Corinthian, except the shopping center and recreational facility. The latter had been previously conveyed by W & B, without Corinthian's consent, to Newport Hills Association, a nonprofit organization. The transaction with Corley also involved the sale of a tract known as Division 14, a valuable portion of Corinthian's remaining property, to which W & B did not have title, but which it had requested under its option agreement. The sale was at a "wholesale" price and did not equal the amount that would have been received by W & B had it continued its activities as contemplated in the original option agreement.

W & B had breached its agreement, at least in the following respects: (1) it had ceased to develop diligently and to resell the property it had acquired from Corinthian; (2) it had acquired and promoted a competing development prior to acquiring, developing, and selling 75 per cent of the Corinthian property; (3) it had sold "in bulk" to Corley the property it owned, at a price which was not equal to the price it would have received had it continued to operate as required. Corinthian, therefore, was justified in refusing to convey Division 14 to either W & B or Corley.

November 13, 1964, Corinthian notified W & B of its intention to terminate the option agreement of June 19, 1957, within 60 days, unless the breaches were remedied. On November 13, 1964, Corinthian filed its complaint in this action. An amended complaint was filed April 21, 1965.

W & B having failed to remedy its defaults, Corinthian

gave notice of termination of the option agreement on January 18, 1965.

## PLEADINGS

In short, the pleadings presented the following issues:

1. Corinthian prayed for damages and equitable relief, including a reconveyance of the lots sold by W & B to Corley. Corinthian also asked for the allowance of attorneys' fees, pursuant to paragraph 19 of the option agreement.

2. W & B denied breach of the contract and counterclaimed, alleging that it had exercised its option for Division 14 and was entitled to specific performance.

3. Corley denied the allegations of Corinthian's complaint, and counterclaimed against Corinthian for damages resulting from a lis pendens that Corinthian had filed effecting title to the 121 lots W & B had sold to Corley. Corley also prayed for specific performance of Corinthian's agreement with W & B to convey Division 14, or in the alternative, for damages.

## JUDGMENT

After extensive pretrial procedures and an extended trial during which the trial court announced two oral opinions and filed a 40-page memorandum decision, judgment was entered April 13, 1966. In the judgment, counsel left no "turn unstoned."

In view of our final disposition of the many facets of the issues presented, it is necessary that we analyze each portion of the judgment.

*First*: Determining that the option agreement of June 19, 1957, was ambiguous (and we find no error in this), the trial court considered evidence of prior circumstances, negotiations, practices, and conduct in order to interpret W & B's obligations under paragraph 11 of the option agreement to "diligently pursue the development and resale" of the property it acquired from Corinthian.

The evidence clearly establishes that the agreement contemplated W & B would develop the raw land it acquired

from Corinthian into a residential subdivision and only sell lots at "retail" to builders, who would construct homes for sale to ultimate residents; and that W & B would retain its capacity to develop and resell the property. We have already alluded to the various departments maintained by W & B in order to accomplish its objective and fulfill its obligations.

The evidence supports the conclusion that W & B breached the agreement of June 19, 1957.

Paragraph 1 of the judgment of April 13, 1966, terminates and extinguishes all right, title, or interest of W & B and Corley in the real property described in the option agreement of June 19, 1957 (Parcels A and B), except that which had been previously conveyed to W & B. The property conveyed is described in 13 recorded deeds identified in the judgment. We affirm paragraph 1 of the judgment.

*Second*: Seven different items (paragraph 2 of the judgment) grant Corinthian a money judgment against W & B for a total of $198,192.08.

We consider the first four of these items together. When the option agreement was terminated, W & B became liable for the additional purchase price for land it had previously acquired under its option, in the amount that the purchase price paid was less than the average of $2,000 per acre. This difference was $41,476.54. W & B was also indebted to Corinthian for one-half of the development profits that had been realized, but not yet paid, in the sum of $40,215.15. In addition, W & B owed an interest payment of $264.07 upon one of the underlying contracts by which Corinthian acquired the property, an obligation W & B had assumed.

May 13, 1965, W & B paid $61,561.73 into court. This sum was received by Corinthian without prejudice to any of its claims. The money was applied as follows:

| | |
|---|---:|
| Additional purchase price | $ 41,476.54 |
| Tucker contract, plus interest | 270.45 |
| On account of development profits | 19,814.74 |
| Total | $ 61,561.73 |

This leaves the following as an obligation of W & B to Corinthian:

| | | | |
|---|---|---|---|
| 1. Interest on $41,476.54 purchase price from January 19, 1965 to May 13, 1965 at 6% per annum | | | $ 788.05 |
| 2. One-half of unpaid development profits to July 1, 1964 | $ 40,215.15 | | |
| Less amount paid into court May 13, 1965 | 19,814.74 | 20,400.41 | |
| 3. Interest on $19,814.74 development profits from January 19, 1965 to May 13, 1965 at 6% per annum | | | 365.03 |
| 4. Interest on $20,400.41 development profits from January 13, 1965 to April 17, 1966 at 6% per annum | | | 1,502.88 |

We have considered carefully the trial judge's meticulous analysis of the above items and find it to be correct. We therefore affirm that portion of paragraph 2 (1), (2), (3), and (4) of the judgment of April 13, 1966, in favor of Corinthian against W & B.

Paragraph 2 (5) of the judgment of April 13, 1966 grants Corinthian a judgment of $12,635.71 against W & B as an adjustment of the accounting between them for the cost of the recreational facility, which W & B had made available to purchasers of lots in the subdivision promoted by it on land acquired from others—not from Corinthian. We find the accounting accurate. Mathematically, the determination of a $12,635.71 judgment against W & B is accurate, but it does not solve the entire problem. The amount was determined by a pro rata distribution of costs to the lots sold in each portion of the two competing properties.

Corinthian still owns approximately 150 acres of its original tract. It will undoubtedly be developed by Corinthian or its successor. Having paid its share of the cost as of the date of settlement, Corinthian still has an interest to see that the recreational facility, for which it paid its share of the cost, is available to those who purchase lots from the

property it still retains. Most wisely, the trial court protected Corinthian when it set forth in the judgment that:

There is reserved to the plaintiff [Corinthian] any claim it may have against the defendants [W & B] for damages in the event that future purchasers, from the plaintiff [Corinthian] or its assigns, of the real property described in the agreement dated the 19th day of June, 1957, shall be refused the use of the recreational facilities now owned by the Newport Hills Association, a nonprofit corporation. Nothing in this action shall be a bar to such claim or shall be in any way construed as a determination of the merit of such claim.

We affirm paragraph 2 (5) of the judgment of April 13, 1966, granting Corinthian a money judgment of $12,635.71 against W & B and also affirm paragraph 6 of said judgment, quoted *supra*.

We pass for later consideration paragraph 2 (6) and (7) of the judgment of April 13, 1966.

*Third*: Paragraph 3 of the April 13, 1966 judgment grants a joint and several judgment of $49,539 against *both* W & B and Corley. The judgment is against W & B because its "wholesale" conveyance to Corley deprived Corinthian of one-half of the profits Corinthian would have received had W & B developed and sold the conveyed land, as agreed, rather than selling it to Corley in bulk. The trial court's determination of $49,539 is based upon the sales record of these lots by Corley. The income from the sales seems reasonable and the accounting accurate; hence, we affirm Corinthian's judgment against W & B in the sum of $49,539 for the loss suffered by it when W & B failed to develop and sell the lots it transferred to Corley.

We do not agree, however, that this amount should be a judgment against Corley because of the alleged tortious interference with Corinthian's option agreement with W & B.

The elements of tortious interference are noted in *Calbom v. Knudtzon*, 65 Wn.2d 157, 396 P.2d 148 (1964):

The basic elements going into a prima facie establishment of the tort are (1) the existence of a valid contrac-

tual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

■ In the instant case, at least one of the elements is missing. W & B first approached Corley's parent corporation regarding the sale of the land. The parent corporation was not interested unless the transaction carried with it a purchase of W & B's mortgage-servicing accounts. Corley's action did not have the requisite quality of inducement. Its participation was merely an acceptance of an offer. Restatement, Torts § 766 Comment i. See *Titus v. Tacoma Smeltermen's Local 25,* 62 Wn.2d 461, 465, 383 P.2d 504 (1963). Corley's participation was not the "moving force" in the breach (*Valley Land Office, Inc. v. O'Grady,* 72 Wn.2d 247, 258, 432 P.2d 850 (1967)), and therefore did not amount to a tortious interference. The $49,539 judgment against Corley is reversed.

*Fourth*: Paragraph 9 of the judgment grants Corley a $15,000 judgment against W & B in the event it cannot convey Division 14 to Corley. Having determined that Corinthian need not convey this property because of W & B's breach, Corley's judgment against W & B is affirmed.

*Fifth: Nature of Agreement*

The crux of this appeal is the trial court's determination (a) that the option agreement of June 19, 1957, is, in fact, an *unconditional contract of purchase* of real estate; (b) that the liquidated damage provision of paragraph 17 is meaningless; and (c) that Corinthian is entitled to a judgment of $112,500 against W & B for damages for breach of the contract to purchase. Since we reverse the $112,500 judgment against W & B (paragraph 2 (6) of the judgment), it is not necessary to discuss the method used to determine the amount.

Standing alone, and not considering the background of the negotiations nor the entire option agreement, paragraph 8, quoted *supra,* would appear to be an unconditional prom-

ise to purchase.

An earlier draft of a proposed agreement—exhibit 77— is couched in the terms of a real estate contract which would have bound W & B to purchase Parcels "A" and "B." It contains a paragraph 8 substantially the same as paragraph 8 of the option agreement. Since in the real estate contract draft W & B had already agreed to buy all the property, paragraph 8 was merely a time schedule for development; it was not the operative portion of the contract to buy.

When the modus operandi was changed from buyer and seller to optionor and optionee, inclusion of paragraph 8 served the same function; namely, to establish a time schedule which W & B had to meet in order to keep the option. Paragraph 8 did not transform the option into anything other than that which it purports to be.

■ Although the testimony covered a wide range, we do not believe that it was error for the trial court to consider parol evidence to explain ambiguous provisions of the contract (*Brower Co. v. Baker & Ford Co.,* 71 Wn.2d 860, 431 P.2d 595 (1967)) and to ascertain the intentions of the parties. *McKennon v. Anderson,* 49 Wn.2d 55, 298 P.2d 492 (1956). We do not find that the parol evidence varied the terms of the option agreement.

The trial court concluded that the liquidated damage provision of paragraph 17 is meaningless because all sums paid to the time of the breach were paid on the purchase price of land conveyed; hence, there was nothing upon which the liquidated damage provision operated. We do not agree. The trial court brushes over the fact that W & B had paid the real estate taxes on *all* of the land and Corinthian's contractual interest for a number of years. Corinthian further benefited by the forced catch-up in payments, to which it was not entitled absent W & B's breach.

Corinthian's claim for damages allegedly arises from (1) W & B's competing development; (2) failure to exercise an option on the remaining Corinthian property; and (3) its abandonment of operations. All fall within the ambit of the liquidated damage provision of paragraph 17 of the option

agreement; hence, the $112,500 judgment for damages is reversed.

■ *Sixth*: We do not agree with W & B's contention that Corinthian is not entitled to judgment for attorneys' fees in this action. Paragraph 19 of the option agreement, quoted *supra*, clearly contemplates that this is an "action . . . to collect any payment or any charge arising" from the agreement. It follows also that a reasonable fee must be allowed for services on appeal. *Puget Sound Mut. Sav. Bank v. Lillions*, 50 Wn.2d 799, 314 P.2d 935 (1957).

We believe it is apparent that the amount of the judgment, including $112,500 damages, was a cogent factor in the trial court's allowance of $50,000 attorneys' fees to Corinthian. Elimination of $112,500 from the judgment changes the picture.

At the time the findings of fact were settled and signed by the trial court, counsel for Corinthian stated that the time charge of members of his firm was "roughly $36,000." In view of the changed circumstances, we believe an allowance of $36,000 attorneys' fees is fair and reasonable; hence, the $50,000 allowance, as it appears in paragraph 2 (7) of the judgment of April 13, 1966, is reduced to this amount.

On appeal, Corinthian is allowed judgment for $7,500 attorneys' fees against W & B.

*Seventh*: That portion of the judgment dismissing with prejudice the counterclaims of Corley, and of W & B against Corinthian, and the cross-claim of Corley against W & B are affirmed.

The judgment of April 13, 1966, from which this appeal is prosecuted, is modified as in this opinion set forth.

FINLEY, C. J., HILL, ROSELLINI, HUNTER, HAMILTON, HALE, and NEILL, JJ., concur.