[No. 5719–1. Division One. September 5, 1978.]

POINT ADAMS PACKING CO., *Respondent,* v. H. A.
DAUBENSPECK, ET AL, *Appellants.*

*Aiken, St. Louis & Siljeg* and *Douglas W. McQuaid,* for
appellants.

*Graham & Dunn* and *Edward W. Pettigrew,* for respondent.

JAMES, J.—Defendant, H. A. Daubenspeck, harvested crab from Alaskan waters. It was processed—packaged, frozen and made ready for shipment—by plaintiff, Point Adams Packing Co., pursuant to a written contract.

The ultimate question at issue is who must pay the Alaska "fishing resource . . . raw material" tax levied upon the crab which Point Adams processed.[1] Alaska Stat. § 43.75.060(2). The trial judge held that the burden of the tax must be borne by Daubenspeck. We agree.

In 1973, Point Adams was in the business of buying and processing raw seafood products in Alaska. Daubenspeck has been a major owner and operator of fishing vessels in Alaska for over 40 years. During 1973, Daubenspeck sold raw crab to Point Adams. Point Adams processed the crab for its own account using its vessel, the *Northgate*. At Daubenspeck's request, the parties agreed that Point Adams would withhold payment for the crab, worth several thousand dollars, until 1974.

In November 1973, Daubenspeck learned that Point Adams was in financial trouble and might shut down its *Northgate* operation. Point Adams was unable to secure operating capital because of an Internal Revenue Service lien against its parent company, Westgate, a California corporation. The continued operation of the *Northgate* was vital to Daubenspeck because it was the only available processing plant in the Adak, Alaska area.

To insure the continued operation of the *Northgate* and protect the crab on board the vessel from a potential Internal Revenue Service lien, the parties entered into a custom packing and processing agreement in late November 1973. The agreement provided that

---

[1] It is undisputed that by Alaska Statute § 43.75.060(2), Point Adams was required to remit the tax which was levied at the rate of 4 percent of the value of the green (unprocessed) crab. The amount of the tax was $13,009.92 plus interest and penalties in the sum of $760.43, for a total of $13,770.35.

commencing November 1, 1973, . . .
>1. Point Adams will process and freeze all crab delivered by Daubenspeck to its processor "Northgate" at Adak
>2. As sole compensation for services performed by Point Adams Packing Co. through its "Northgate" facilities, Daubenspeck will pay $.97 (97 cents) per pound of finished meat produced from all raw crab delivered.

Exhibit 1.

The agreement extinguished Point Adams' obligation to pay for the crab previously delivered and ownership of the crab was returned to Daubenspeck by predating the agreement to October 14, 1973. Under this agreement, Daubenspeck paid for processing of 591,360 pounds of crab. The agreement contained no provision concerning the payment of the raw fish tax.

In April of 1974, the State of Alaska notified Point Adams of the $13,009.92 tax which had been levied against the raw crab processed for Daubenspeck. Point Adams paid the tax and brought this action seeking reimbursement from Daubenspeck.

The trial judge's decision in favor of Point Adams was in accordance with evidence from expert witnesses who testified that in the absence of an express agreement, it was the custom or usage of trade in the industry for the owner of fish products to reimburse the processor for the taxes levied by the State.

On appeal, Daubenspeck contends it was error to admit parol evidence to vary the terms of the agreement. He asserts that his contract with Point Adams is complete and unambiguous and that neither the common law nor the Uniform Commercial Code (RCW 62A) permits consideration of parol evidence to vary its terms.

Daubenspeck argues that the payment of the 4 percent tax was one of the contemplated "services [to be] performed by Point Adams." Exhibit 1. He likens the fishing

resource raw material tax to other overhead expenses normally paid by a processor such as insurance premiums, payroll, employment and income taxes.

By unchallenged expert testimony, Point Adams established that although the Alaska statute expressly provides that "[t]he person, firm, or corporation" which "actually and physically processes . . . fishery resources shall be liable for and shall pay . . . the whole tax imposed . . ." (Alaska Stat. § 43.75.060(5)), it is the well established trade custom and usage in Alaska that, although "[t]he processor [is] responsible for the payment of the tax, . . . he in turn is reimbursed by the owner of the product that has been processed."

The experts testified that this well recognized custom resulted from the historical development of Alaska's taxing scheme. As explained by the witnesses, Alaska originally levied its tax based upon the value of the raw, unprocessed seafood against the owners. Experience demonstrated, however, that often those who harvested the products were transients who departed from the jurisdiction after having their product processed. Alaska protected itself by making the processor its "tax collector."

Daubenspeck testified that at the time of the agreement, he was under pressure; that he didn't think "it was a good business arrangement"; that if he had been unable to deal with Point Adams, he would have "had to pull the pots and quit fishing"; and that in his "own mind," the 97 cents per pound "was the sole compensation for what they were to do." Significantly, Daubenspeck, a person with vast experience in Alaska fisheries, did not testify concerning the usage of trade described by Point Adams' experts.

Although the briefs of both parties assume the applicability of the Uniform Commercial Code, we point out that the provision of the code, RCW 62A.2-202(a), which permits "usage of trade" evidence, regulates "sales." The contract here was for services. We hold, however, that the evidence was admissible under the common law of contracts

and therefore we do not consider the applicability of the code.

 In *Dennis v. Southworth,* 2 Wn. App. 115, 120, 467 P.2d 330 (1970), it is pointed out that:

It is elementary contract law that the primary factor to be considered in determining the meaning of a written contract is the intention of the parties. Where the terms of the contract taken as a whole are plain and unambiguous, the meaning will be deduced from its language alone, without resort to parol evidence or any other aids to construction. But if the language of a contract is ambiguous, or has material omissions, it becomes the duty of the court to determine the intention of the parties by viewing the contract as a whole and considering all of the circumstances leading up to its execution, including the subject matter and the subsequent acts and conduct of the parties. *See Boeing Airplane Co. v. Firemen's Fund Indem. Co.,* 44 Wn.2d 488, 268 P.2d 654, 45 A.L.R.[2d] 984 (1954).

Parol evidence is admissible to determine the intention of the parties, explain ambiguities, supply omissions or prove whether or not oral agreements were or were not merged in a written contract. *Corinthian Corp. v. White & Bollard, Inc.,* 74 Wn.2d 50, 442 P.2d 950 (1968).

██ We are persuaded that the trial judge correctly determined that the Alaska fish tax was not a normal operating expense included in the "services" performed by Point Adams. Both parties were aware of the tax and failed to provide for its payment in either their written agreement or by a contemporary oral understanding. Under these circumstances, competent evidence of a trade custom or usage was properly considered by the trial judge.

The cases are of one accord in holding that parol evidence of a usage or custom prevailing in the trade with reference to which the parties dealt is admissible, not to contradict or vary the terms of the contract as expressed in the memorandum, but for the purpose of explaining an ambiguous written term or to supply omitted words. The parties may contract with reference to a custom known to both, and then proof of the custom may explain and make definite a writing otherwise vague and of doubtful meaning. Merchants and traders, being required to

transact business swiftly, should be permitted to assume that the usages and customs of the business enter into their contracts even though they are not stated in the written memoranda of their transactions.

(Footnotes omitted.) 72 Am. Jur. 2d *Statute of Frauds* § 297 (1974). *Accord, Stender v. Twin City Foods, Inc.,* 82 Wn.2d 250, 510 P.2d 221 (1973).

Affirmed.

ANDERSEN, A.C.J., and CALLOW, J., concur.

Reconsideration denied October 17, 1978.