# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JAMES and JUDITH BETOURNAY, Oregon State residents, | No. 52313-2-II |
| Plaintiffs below | |
| PRISCILLA STEVENS, | |
| Plaintiff Intervenor below/Respondent. | |
| v. | |
| 2ND HALF, LLC, a Washington limited liability company; AMARRA MANNA, a Washington resident, | UNPUBLISHED OPINION |
| Appellants.[1] | |

MELNICK, J. — Priscilla Stevens and her grandmother, Sara Ristick, had an option agreement to purchase real property in Tacoma from 2nd Half LLC. Ammar Manna'a[2] then purchased the property from 2nd Half, subject to the option agreement. After a bench trial, the court determined that Manna'a and his agents breached the option agreement and intentionally interfered with a contractual relationship.

Manna'a contends that the court's findings of fact do not support its conclusion of law that he intentionally interfered with a contractual relationship. He also contends that the court erred by reforming the contract to allow Stevens to exercise the option alone after Ristick passed away, by

---

[1] RAP 3.4 allows this court on its own motion to change a case title. It is ordered that the court clerk shall change the title of this case to reflect the case title in this opinion.

[2] His name is alternatively spelled Manna.

extending the time for the option to be exercised, and by awarding attorney fees as damages. He further argues that Stevens is not entitled to equitable relief because she has unclean hands. We disagree. Manna'a finally argues that the court erred by awarding attorney fees as damages. We agree. We affirm in part and reverse in part.

## FACTS[3]

On June 5, 2013, Jeff Graham, the manager of 2nd Half, entered into an option agreement to sell real property in Tacoma to Stevens and her grandmother, Ristick. The option agreement referenced a lease agreement for the same property, and the lease agreement referenced the option agreement. The option agreement had a May 30, 2016 deadline for closing. The option price for the property was $116,000. Ristick died in 2015.

The option agreement provided in relevant part:

e. Method of Exercising Option. The only method for exercising the option is to tender into escrow, on or before the expiration date, the entire option price; provided, however, that the parties may make subsequent agreements in writing that alter or amend the expiration date or method of exercising the option. Costs of any escrow and excise tax will be born entirely by the Grantee/Buyer. Costs of title insurance, if any is desired, will be paid entirely by Grantee/Buyer.

Clerk's Papers (CP) at 129.

On March 17, 2016, prior to closing on the property, Stevens signed a listing agreement to sell the property. Even though she was not the authorized owner or manager of 2nd Half, Stevens's grandfather, Ron Steve, represented to the listing agent that she was. She listed 2nd Half as the

---

[3] The procedural history of this case is a bit unusual. In an unrelated lawsuit, parties named Betournay won a money judgment against 2nd Half. However, before the court entered judgment, 2nd Half executed a statutory warranty deed transferring title to Manna'a. The Betournays asked the court to place a lien on the property to satisfy the judgment, claiming that 2nd Half fraudulently transferred the property. The court then granted Priscilla Stevens motion to intervene. The Betournays then successfully moved to dismiss their claims. The case then proceeded to trial with Stevens against 2nd Half and Manna'a.

sellers. At that time, because the option had not been exercised, Stevens did not own the residence and she had no connection at all with 2nd Half, except for the option agreement.

On April 11, Stevens signed a purchase and sale agreement for the property. She signed on behalf of 2nd Half. The agreement listed the buyer by name. The transaction was sent to Rainier Title for closing; however, on May 13, Rainier Title refused to close on the transaction. It cited various reasons including that Stevens had no managerial relationship to 2nd Half and that 2nd Half sold the property to Manna'a.

On April 19, 2nd Half transferred the title to the property to Manna'a, subject to Stevens's option agreement. 2nd Half was controlled by his friend and business partner, Jeff Graham.

While listing the property for sale, Stevens sought financing so she could exercise the option agreement. She worked with Shawn Adkins, a commercial money broker. Pinnacle Equity Group, through its employee, Chris Unger, "was ready, willing, and able to loan $150,000 to Stevens, which would have been more than enough to close on the option agreement." CP at 130-31. After Adkins and Unger learned of Rainier Title's resignation, they had a new purchase and sale agreement drawn up between Manna'a as seller and Stevens as buyer.

On May 17, Adkins took the new agreement to John Stratford Mills, attorney for Manna'a. Adkins requested that Mills call him. Instead, Mills showed up at Adkins's office unannounced, and for a period of twenty to twenty-five minutes discussed the bad history between the parties. He made negative comments about Ron Steve, and discouraged Adkins from getting involved or making a loan to Stevens. At the same time, Mills insisted that Manna'a would close if the transaction closed in the name of the deceased Sara Ristick. A letter from Mills accompanied the meeting. It claimed Manna'a would honor the option agreement, but it also said "Ammar isn't

interested in selling the property and is not going to sign your Purchase and Sale Agreement." CP at 131.

On May 31, Manna'a entered into a purchase and sale agreement with the same buyers that Stevens had earlier procured. Though the agreement had a date of May 31, the buyers signed the agreement on May 22, eight days before the option agreement with Stevens expired. Manna'a also used the same real estate agent and sold the property at the price Stevens agreed to in the earlier failed transaction.

Manna'a has a bad history with Steve.[4] The following are the final findings of fact.

> 31.  Mr. [Manna'a's] interest in obtaining the property was motivated, in part, by revenge against Ron Steve for past business and legal problems. Mr. [Manna'a] was also motivated to not perform on the option agreement by greed. He and his friends/business partners worked both before and after the option deadline to impede the exercise of the option by trying to influence loan brokers and lenders, conveying the property away from 2nd Half LLC, entering into another contract to sell to the Garlingtons, and refusing to cooperate with Ms. Stevens and the people assisting her.

CP at 132.

> 32.  Ms. Stevens was ready, willing and able to perform her obligations under the option agreement until stymied by Mr. [Manna'a's] actions. While her actions, and those of Mr. Steve, in holding herself out as 2nd Half LLC in the Purchase and Sale Agreement with the Garlingtons in April 2016, are not condoned in any way by this Court, that act did not kill the ability to make the option agreement work. Those acts involved a transaction to sell the property, which couldn't happen unless and until Ms. Stevens was able to exercise the option agreement. It also was not clear in the testimony that those acts were what caused Rainier Title to resign. The acts that killed the ability to make the option agreement work were done by Mr. [Manna'a], Mr. Graham, and Mr. Mills.

CP at 132.

> 33.  Mr. [Manna'a] had no intention of closing on the option. Such lack of intention to cooperate in good faith and close on the option was further and starkly demonstrated after the court in this case ordered disclosure of Ms. Stevens's lender, which occurred by court filing on Friday, August 5, 2016. On Monday,

---

[4] For details of the history, see findings of fact 30 and 31 at Clerk's Papers 132.

August 8, 2016, the disclosed lender, Mr. Unger, was subjected to a sustained barrage of harassment and intimidation by both Mr. Graham and Mr. Mills on behalf of Mr. [Manna'a]. Such conduct included, *inter alia*, implied threats by Mr. Graham by text to release Mr. Unger's social security number to the public, inserting Mr. Unger's home address into the demands, causing concern for Mr. Unger's family, threatening to give any of Mr. Unger's Facebook friends $500 to serve Mr. Unger with a subpoena to a deposition, disclosing Mr. Unger's past bankruptcy to his employer, and threatening to examine and expose the business dealings of Mr. Unger's employer. Some of these threats were made late at night. Mr. Mills's conduct included efforts to "friend" Mr. Unger on Facebook, which was disconcerting to Mr. Unger since he did not know Mr. Mills and his Facebook account related to his personal life, Mr. Mills's offer to take him out for a beer, and Mr. Mills sending a communication explaining that Mr. Unger could avoid such "hassle" by simply signing a declaration which Mr. Unger believed to be false.

CP at 132-33.

The court concluded that Manna'a breached the contract in several ways. It also concluded that Manna'a and his agents, Mills and Graham, intentionally interfered with the contractual relationship with Stevens's exercise of the option.

The court awarded monetary damages as well as specific performance of the option agreement. It also awarded attorney fees to Stevens. 2nd Half and Manna'a appeal.

ANALYSIS

I.    BREACH OF CONTRACT AND TORTIOUS INTERFERENCE

Manna'a argues that the court erred in determining that he both breached and tortiously interfered with Stevens's contract. He argues that because 2nd Half transferred its interest in the property to Manna'a before any of the events of alleged interference took place, there was no contractual relationship between 2nd Half and Stevens to interfere with. We disagree.

A.    Legal Principals

"The party seeking review has the burden of perfecting the record so that the reviewing court has before it all of the relevant evidence." *Bulzomi v. Dep't of Labor & Indus.*, 72 Wn. App. 522, 525, 864 P.2d 996 (1994). A failure to provide a verbatim transcript of the record below

5

renders the trial court's findings of fact verities and binding on appeal. *Morris v. Woodside*, 101 Wn.2d 812, 815, 682 P.2d 905 (1984). Consequently, the scope of review is limited to determining whether the findings support the trial court's conclusions of law and judgment. *Haberman v. Elledge*, 42 Wn. App. 744, 746, 713 P.2d 746 (1986).

Because Manna'a did not provide a verbatim transcript of the record, the findings of fact are verities. *Woodside*, 101 Wn.2d at 815.

An option to purchase property is a contract where the property owner, in return for valuable consideration, grants another the right to purchase the property within a specified time on the terms and conditions of the option. *Corinthian Corp. v. White & Bollard, Inc.*, 74 Wn.2d 50, 52, 442 P.2d 950 (1968). If the option to purchase real estate is exercised within the time specified in the contract, the seller must convey the property. But if the purchase price is not paid or tendered within the specified time, the seller has no obligation to convey the property. *Spokane, Portland & Seattle Ry. Co. v. Ballinger*, 50 Wash. 547, 549-50, 97 P. 739 (1908).

To prevail on a breach of contract claim, a party must prove that (1) a duty imposed by contract existed, (2) that the duty was breached, and (3) there are damages proximately caused by the breach. *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995).

A claim for tortious interference with a contractual relationship or business expectancy requires five elements: (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage. *Commodore v. Univ. Mech. Contractors, Inc.*, 120 Wn.2d 120, 137, 839 P.2d 314 (1992).

B.      Analysis

The option agreement created a valid contractual relationship between Stevens and 2nd Half. Manna'a's argument that no contractual relationship existed to interfere with is undermined by the fact that the transfer in ownership of the property itself constituted an attempt to interfere with the option contract. The court determined that Manna'a had no intention of closing on the option. The transfer itself, therefore, was an interference. These same facts support the conclusion that a breach of contract occurred.

Manna'a understood that he took title subject to the agreement and, therefore, had knowledge of the relationship. An intentional interference caused a termination. Counsel for Manna'a discouraged a money lender from making a loan to Stevens. Manna'a "worked both before and after the option deadline to impede the exercise of the option by trying to influence loan brokers and lenders, convey[ed] the property away from 2nd half, [and] enter[ed] into another contract to sell to [a third party]." CP at 132.

Manna'a interfered for an improper purpose. Revenge against Steve for past business and legal problems motivated Manna'a to obtain the property from 2nd Half. Greed motivated Manna'a to repudiate the contract. Stevens did not exercise the option in a timely manner because the interference caused (in part) the escrow agent to resign from the transaction. Manna'a's, Graham's and Mills's actions "killed the ability to make the option agreement work." CP at 132.

The findings of fact support the conclusion that Manna'a and his agents, Mills and Graham, both breached the contract and intentionally interfered with the contractual relationship created by the option.

II.    REMEDIES

Manna'a argues that the court erred when it allowed Stevens to exercise the option alone, when the original contract named two parties. He argues that because Stevens did not plead or prove that there was a novation or assignment from Ristick, the court impermissibly reformed the contract.[5] He also argues that the court erred by reforming the contract to extend the date of expiration beyond the original date set in the contract.

A.    Legal Principals

In matters of equity, trial courts have broad discretionary power to fashion equitable remedies. We review the authority of a trial court to fashion equitable remedies under the abuse of discretion standard. *Rupert v. Gunter*, 31 Wn. App. 27, 30, 640 P.2d 36 (1982). An abuse of discretion occurs when the trial court's decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006).

"There is in every contract an implied duty of good faith and fair dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991).

Specific performance is an appropriate remedy when the plaintiff shows that the defendant acted in bad faith and hindered the plaintiff from fulfilling performance under the contract. *Cavell*

---

[5] Manna'a argues that absent a novation or assignment, Ristick could not be removed from the contract. A novation is a mutual agreement among all parties to discharge a valid existing obligation by the substitution of a new valid obligation or substitution of one party for another. *MacPherson v. Franco*, 34 Wn.2d 179, 182, 208 P.2d 641 (1949). An assignment occurs when a party to a contract transfers their rights or benefits under the contract to another person. RESTATEMENT (SECOND) OF CONTRACTS § 317 (AM. LAW INST. 1981). Neither party argues that there was a novation or an assignment. At issue is whether the party reformed the contract given that there was no novation or assignment. Therefore, we do not address novation or assignment.

*v. Hughes*, 29 Wn. App. 536, 539-40, 629 P.2d 927 (1981). "Specific performance is frequently the only adequate remedy for a breach of a contract regarding real property because land is unique and difficult to value." *Pardee v. Jolly*, 163 Wn.2d 558, 568-69, 182 P.3d 967 (2008).

The grantor of an option is "under a duty not to 'repudiate or make performance impossible or more difficult.'" *Thompson v. Thompson*, 1 Wn. App. 196, 200, 460 P.2d 679 (1969) (quoting *McFerran v. Heroux*, 44 Wn.2d 631, 638, 269 P.2d 815 (1954)).

Reformation is an equitable remedy employed to bring a writing that is materially at variance with the parties' agreement into conformity with that agreement. *Akers v. Sinclair*, 37 Wn.2d 693, 702, 226 P.2d 225 (1950). A party may seek reformation of a contract if (1) the parties made a mutual mistake or (2) one of them made a mistake and the other engaged in inequitable conduct. *Washington Mut. Sav. Bank v. Hedreen*, 125 Wn.2d 521, 525, 886 P.2d 1121 (1994).

"Courts are not at liberty, under the guise of reformation, to rewrite the parties' agreement and 'foist upon the parties a contract they never made.'" *Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co.*, 139 Wn.2d 824, 833, 991 P.2d 1126, 1 P.3d 578 (2000) (internal quotation marks omitted) (quoting *Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co.*, 92 Wn. App. 214, 220, 963 P.2d 204 (1998)).

"On the death of a joint obligee, unless a contrary intention was manifested, the surviving obligees are solely entitled as against the promisor to receive performance." RESTATEMENT (SECOND) OF CONTRACTS § 301 (AM. LAW INST. 1981).

In general, issues not raised in the trial court may not be raised on appeal. RAP 2.5(a); *Roberson v. Perez*, 156 Wn.2d 33, 39, 123 P.3d 844 (2005).

B.    Reformation Removal of Ristick

Manna'a argues for the first time on appeal that the court reformed the contract by ordering specific performance. Even though Manna'a raises this argument for the first time on appeal, we resolve the issue on the merits against him.

Although the original agreement named both Stevens and Ristick as holders of the option, the court did not use "the guise of reformation" to rewrite the contract. The court properly granted specific performance of the option to allow the transaction to close in the name of Stevens alone because Ristick is deceased. Principles of contract law support Stevens's ability to exercise the option alone. The contract named Ristick and Stevens as joint obligees and entitled them to exercise the option, which then required 2nd Half/Manna'a to sell the property. After Ristick's death, Stevens, as the surviving obligee, was entitled as against 2nd Half/Manna'a to receive performance. *See* RESTATEMENT (SECOND) OF CONTRACTS § 301. Manna'a does not cite authority to support the claim that Ristick must remain as an obligee after her death.

C.    Equitable Grace Period

Manna'a argues that the court erred by reforming the contract to extend the date of expiration beyond the original date set in the contract. We disagree.

As a general rule, option contracts "are to be strictly construed and time is of the essence." *Jolly*, 163 Wn.2d at 572. However, equitable relief from such strict construction may be warranted in limited circumstances where an inequitable forfeiture would otherwise result. *Wharf Rest., Inc. v. Port of Seattle*, 24 Wn. App. 601, 611, 605 P.2d 334 (1979).

Whether an equitable grace period is appropriate depends on the facts and circumstances of a case and is largely within a trial court's discretion. *Heckman Motors, Inc. v. Gunn*, 73 Wn. App. 84, 88, 867 P.2d 683 (1994).

10

In determining whether an equitable grace period is appropriate, we will consider the following factors: (1) whether the lessee's failure to give timely notice was inadvertent rather than intentional, culpable, or grossly negligent; (2) whether the lessee made valuable permanent improvements; (3) whether the lessor was prejudiced by the untimely notice; (4) the length of the lease; and (5) whether the lessor contributed to the delay. However, not all five of the circumstances need be present in every case in which an equitable grace period is granted. *Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship*, 158 Wn. App. 203, 218, 242 P.3d 1 (2010).

In this case, the court properly ordered specific performance and granted Stevens additional time to exercise the option based on the unlawful actions of Manna'a and his agents. They clearly contributed to Stevens's inability to close on the option agreement. The court found that Manna'a and his agents "killed the ability to make the option agreement work." CP at 132.

III.     UNCLEAN HANDS

Manna'a argues that Stevens is barred from equitable relief because she signed the Purchase and Sales Agreement for the property on behalf of 2nd Half. He argues this fraudulent conduct caused the escrow agent to resign from the transaction, and therefore Stevens cannot be granted equitable relief under the doctrine of unclean hands.

We do not address this issue because Manna'a raises it for the first time on appeal. RAP 2.5(a).

IV.     ATTORNEY FEES AT TRIAL

Manna'a argues that the trial court erred in awarding attorney fees as damages, because attorney fees are not awardable as damages when fees are incurred in the same proceeding as being requested.

11

Stevens argues that the court properly awarded attorney fees because the fees were awarded as damages, rather than costs, and because they alternatively were awarded for bad faith conduct.

The court concluded that the intentional interference caused damages. Stating:

> Such damages are not in the traditional sense of special damages, but such conduct forced Ms. Stevens to court in this case. . . . While the option agreement and the lease agreement do not have an attorney fee clause, the damages that flow naturally and causally from such interference are the costs of defending the eviction and prosecuting this action. Interfering with a legal matter gives rise to legal costs to remedy the breach of duty. The Court finds such costs are awardable not as contractual attorney fees but as damages.

CP at 134.

The standard of review for an award of attorney's fees is abuse of discretion. *Greenbank Beach & Boat Club, Inc. v. Bunney*, 168 Wn. App. 517, 524, 280 P.3d 1133 (2012).

The general rule in Washington, commonly referred to as the American rule, is that each party in a civil action will pay its own attorney fees and costs. *In re Impoundment of Chevrolet Truck*, 148 Wn.2d 145, 160, 60 P.3d 53 (2002). However, "a more accurate statement of Washington's American rule is attorney fees are not available as *costs or damages* absent a contract, statute, or recognized ground in equity." *City of Seattle v. McCready*, 131 Wn.2d 266, 275, 931 P.2d 156 (1997).

The case law regarding attorney fees awardable as costs of an action is well developed. *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 139 Wn. App. 743, 759, 162 P.3d 1153 (2007). "The case law regarding attorney fees recoverable as damages is significantly less well developed. In the majority of cases which have discussed attorney fee damage recoveries, such recoveries have been based on principles of equitable indemnity." *Jacob's Meadow Owners Ass'n*, 139 Wn. App. at 759. Specifically, "when the natural and proximate consequences of a wrongful act by defendant involve plaintiff in litigation with others, there may, as a general rule, be a

recovery of damages for the reasonable expenses incurred in the litigation, including compensation for attorney's fees." *Wells v. Aetna Ins. Co.*, 60 Wn.2d 880, 882, 376 P.2d 644 (1962).

We recognize a number of equitable exceptions to the no-attorney-fees rule. A court may award attorney fees if the losing party's conduct constitutes bad faith or wantonness. *Public Util. Dist. No. 1 of Snohomish County v. Kottsick*, 86 Wn.2d 388, 390, 545 P.2d 1 (1976); *State ex rel. Macri v. City of Bremerton*, 8 Wn.2d 93, 113, 111 P.2d 612 (1941). Bad faith can warrant an award of attorney fees for three types of conduct: (1) prelitigation misconduct, (2) procedural bad faith, and (3) substantive bad faith. *Rogerson Hiller Corp. v. Port of Port Angeles*, 96 Wn. App. 918, 927-30, 982 P.2d 131 (1999). However, we have determined that "'[t]o allow an award of attorney fees based on bad faith in the act underlying the substantive claim would not be consistent with the rationale behind the American Rule regarding attorney fees.'" *Greenbank Beach & Boat Club*, 168 Wn. App. at 527 (quoting *Shimman v. Int'l Union of Operating Eng'rs Local 18*, 744 F.2d 1226, 1231 (6th Cir. 1984)).

The trial court awarded attorney fees as damages rather than costs. The award of attorney fees as damages is confined to situations where the defendant's wrongful act required the plaintiff to engage in litigation with a third party. That is not the case here. Manna'a's wrongful act did require Stevens to engage in litigation, but not with a third party. Therefore, we determine that this exception does not apply.

Stevens argues that we could alternatively uphold the award of attorney fees as damages under the bad faith exception. In the few cases where a court has awarded based on bad faith, the awards are as costs, as opposed to an element of damages. However, Washington courts have contemplated bad faith as a reason to award attorney fees as damages. See *State ex rel. Macri*, 8 Wn.2d at 113 ("in certain circumstances fraud or malice may furnish a basis for the recovery of

the expenses of litigation, including counsel fees, as an element of damages."). Even if we were to determine that the bad faith exception applies in cases where attorney fees are awarded as damages, the award would still be improper.

The court determined that Manna'a had breached the duty of good faith and fair dealing, by engaging in conduct that constituted bad faith. However, the bad faith actions by Manna'a are the actions underlying the substantive claim of this case, and so the award of fees are inconsistent with the rationale behind the American rule. *Greenbank Beach & Boat Club*, 168 Wn. App. at 527. Therefore, we conclude that the trial court abused its discretion in awarding attorney fees.[6]

ATTORNEY FEES

Stevens requests attorney fees under RAP 18.1(a) because applicable law grants the right to recover reasonable attorney fees. She also argues that she should receive attorney fees under RAP 18.9 because of delay, frivolousness, and failure to comply with the rules of appellate procedure.

RAP 18.1(a) allows a prevailing party to recover attorney fees on appeal if "applicable law grants to a party the right to recover reasonable attorney fees."

In determining whether an appeal is brought for delay, we inquire whether, when considering the record as a whole, the appeal is frivolous. *Streater v. White*, 26 Wn. App. 430, 434, 613 P.2d 187 (1980). In determining whether an appeal is frivolous we consider the following: (1) A civil appellant has a right to appeal under RAP 2.2; (2) all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant; (3) the record should be considered as a whole; (4) an appeal that is affirmed simply because the arguments are rejected is not for that reason alone frivolous; (5) an appeal is frivolous if there are no debatable issues on

---

[6] To be clear, the court did not err in awarding the $2,500 application fee loss.

which reasonable minds might differ, and the appeal is so totally devoid of merit that there was no reasonable possibility of reversal. *Streater*, 26 Wn. App. at 434-35.

Because this appeal does not present any exceptions to the American rule, discussed above, applicable law does not grant the right to attorney fees under RAP 18.1.

This appeal is not frivolous, it was not brought for delay, and the award of attorney fees is not supported.

We affirm in part and reverse in part.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Maxa, C.J.

_____
Sutton, J.