**Robert BROTHERSON, et al., Plaintiffs,**

v.

**The PROFESSIONAL BASKETBALL CLUB, L.L.C., Defendant.**

**No. C07–1787RAJ.**

United States District Court, W.D. Washington.

July 1, 2009.

Lynn Lincoln Sarko, Mark Adam Griffin, Amy C Williams-Derry, Keller Rohrback, Michael David Myers, Myers & Company, Seattle, WA, for Plaintiffs.

Bradley S. Keller, Paul R. Taylor, Christina L. Haring, John Arthur Tondini, Steven C. Minson, Byrnes & Keller, Paul L. Schneiderman, Law Offices of Paul L. Schneiderman, Seattle, WA, for Defendant.

## ORDER

RICHARD A. JONES, District Judge.

### I. INTRODUCTION

This matter comes before the court on a motion (Dkt.# 150) for reconsideration of a portion of the court's February 23, 2009 order (Dkt.# 148) on several summary judgment motions, and the resolution of a motion calendar created in that order to determine if this case should be certified as a class action. For the reasons stated herein, the court DENIES the motion for reconsideration and certifies a Fed.R.Civ.P. 23(b)(3) class. The court directs the clerk to terminate the motion calendar. This order concludes with instructions and deadlines regarding notice to class members and management of this action.

### II. BACKGROUND

In the February 23 order, the court substantially narrowed this action in resolving several summary judgment motions. The court declines to repeat much of the February 23 order, but briefly summarizes the status of this action.

In the buildup to the departure of the Seattle Supersonics (the "Sonics") to become the Oklahoma City Thunder, Plaintiffs Robert Brotherson, Carolyn Bechtel, and Patrick Sheehy sued The Professional Basketball Club, L.L.C. ("PBC"), who own the Sonics. In the February 23 order, the court dismissed Plaintiffs' Washington Consumer Protection Act claim and any claim for equitable relief. Only one claim survived: Plaintiffs' claim for breach of what the court has called the "Emerald Club Contract." The Contract, which PBC offered to virtually all Sonics 2007 season ticket holders, let them renew their tickets for the 2008 season at 2007 season prices, and, critically for purposes of this action, gave them the option to renew at the same price for the 2009 and 2010 seasons. Plaintiffs are Emerald Club members.

The court held that Plaintiffs had established all facts necessary to prevail on their breach of contract claim, with a few exceptions. The evidence did not permit the court to conclude, as a matter of law, whether Plaintiffs had waived or forfeited their renewal option for the 2009 season, and thereby lost their right to renew in 2010. Feb. 23 Ord. at 19. In particular, the evidence did not establish as a matter of law what PBC's and ticket holders' obligations were with respect to the renewal option. *Id.* at 19–21. Was PBC obligated to contact Emerald Club members and instruct them on how to exercise the renewal option at the end of the 2008 season, as it had done when it offered the Emerald Club Contract a year earlier? Were ticket holders obligated to take additional actions in pursuit of their right to renew? In light of these unresolved issues, the court held that "a jury must decide whether Plaintiffs acted appropriately to exercise their options for the 2009 season, or whether PBC's failure to make renewal available excuses Plaintiff's failure to insist more vehemently that PBC honor its commitment." *Id.* at 21 (reserving, in addition, the question of whether the court should exercise its equitable power to excuse any ticket holder's delay in exercising the option). The court also reserved the question of damages for the jury. *Id.* at 21–22.

The court also stated that it was "preliminarily inclined" to certify a class consisting of all persons who entered the Emerald Club Contract. *Id.* at 29. It held that the proposed class met the four prerequisites of Fed.R.Civ.P. 23(a). *Id.* at 29–30. It re-

quested additional briefing, however, to address whether the proposed class satisfied the additional requirements of Fed.R.Civ.P. 23(b)(3).

The court has now received the supplemental briefing, along with a motion from Plaintiffs to reconsider a portion of the February 23 order.

## III. ANALYSIS

### A. The Court Denies Plaintiffs' Motion for Reconsideration.

The court begins with Plaintiffs' motion for reconsideration, which asks the court to rule that Plaintiffs did not waive or forfeit their renewal options as a matter of law. The court ruled on February 23 that a jury must decide that question. Motions for reconsideration are "disfavored," and the court will deny them unless they show "manifest error in the prior ruling" or a "showing of new facts or authority [that] could not have been brought to [the court's] attention earlier with reasonable diligence." Local Rules W.D. Wash. CR 7(h)(1).

Plaintiffs focus on the latter prong of the reconsideration standard, offering new evidence about the parties' actions with respect to exercising the renewal option for the 2009 season. They contend that this evidence shows that, as a matter of law, they did not waive or forfeit their renewal option. They point out that in August 2008, they moved to amend their complaint to assert an injunctive relief claim requiring, among other things, that PBC extend Plaintiffs the right to purchase 2009 Thunder season tickets in accordance with the Emerald Club Contract. PBC's counsel was quoted later the same month in a Seattle newspaper deriding Plaintiffs' request for tickets in Oklahoma City. In a September 2008 interrogatory response, PBC indicated that it would not honor the renewal option. Myers Decl. (Dkt.# 151),

Ex. B. Finally, Plaintiffs offer evidence that at least some 2008 Sonics season ticket holders contacted PBC before the 2009 season to request information on renewal. PBC representatives sent them e-mails stating that decisions on renewal were on hold until the conclusion of the then-active litigation over whether PBC could break its lease at Seattle's Key Arena.[1]

None of this evidence warrants a different outcome on summary judgment. Although the evidence Plaintiffs highlight may be relevant to claims over the Emerald Club renewal option, it does not establish that either Plaintiffs or all putative class members acted to request renewal. Plaintiffs' own statements about their desire to exercise the renewal option for the 2009 season have been equivocal. Both in pleadings in this action and in their depositions, all three of them have expressed an unwillingness to renew their tickets for a team playing in Oklahoma City. E.g., Tondini Decl. (Dkt.# 156), Ex. 4 (Brotherson Depo. at 28–29) (testifying in May 2008 that he would not renew tickets for a team that would be leaving Seattle in two years), Ex. 5 (Bechtel Depo. at 31) (testifying that she would not have bought 2008 season tickets if she had known the team would move), Ex. 6 (Sheehy Depo. at 86) (expressing uncertainty in September 2008 about whether he would renew). On the other hand, they correctly point out that they have indicated in amendments to their complaint and in discovery that they wish to reap the potential benefits of exercising the option. The court cannot resolve this contradictory evidence on summary judgment. When PBC's counsel derided Plaintiffs' claim for renewal in August 2008, he did so in the context of responding to their claim for an injunction that would have required PBC to fly them to Oklahoma City and provide lodging for every Thunder game. Plaintiffs later withdrew those claims, in response to a court order querying whether they "seriously in-

---

1. In their briefing on class certification, Plaintiffs assert that PBC sent such e-mails "to *all* class members" or "*all* Emerald Club members." Dkt. # 154 at 6, 16 (emphasis added). The evidence presented in their motion for reconsideration, however, establishes only that two ticket holders received such e-mails. Myers Decl. (Dkt.# 153), Exs. A–C. The deposition testimony

of Sonics official Brian Byrnes suggests that the PBC sent such communications to other Emerald Club members, but not necessarily to all or even most of them. Schoepflin Decl. (Dkt.# 99), Ex. B (Byrnes Depo. at 111–12). Without better evidence, the court has no basis to conclude as a matter of law that all ticket holders received similar communications.

tend[ed] to pursue injunctive relief" and reminding them of their obligations under Fed. R.Civ.P. 11. Dkt. # 91 (Sept. 26, 2008 order); Dkt. # 96 (withdrawing bulk of injunctive relief request in response to order); Dkt. # 121 (filing November 2008 amended complaint with newly limited injunctive relief claim). On summary judgment, the court has no basis to determine whether counsel was merely mocking overbroad claims that Plaintiffs later withdrew, or was making a statement that PBC would not honor the Emerald Club renewal option.

The court also observes that there is no evidence that would permit it to reach any conclusions as a matter of law as to the more than 1200 members of the Emerald Club other than the three Plaintiffs. At all points in this litigation, Plaintiffs have represented only themselves, and absent legal authority to the contrary, the court has no basis to conclude that their amended complaint or interrogatories placed PBC on notice as to whether all Emerald Club members wished to renew. Similarly, PBC's counsel's comments are not dispositive as to PBC's intent regarding the renewal options of persons other than the three Plaintiffs. Finally, even if PBC sent e-mails like the ones Plaintiffs identified (*supra* n. 1) to all Emerald Club members, they do not establish as a matter of law that Emerald Club members did not waive or forfeit their renewal option. Again, the court considers this evidence in the context of a summary judgment motion. The question is not whether Plaintiffs are likely to prevail in demonstrating that PBC did not honor the renewal option, that no Emerald Club member could have convinced them to do so, and that no member was required to do more to preserve his or her renewal option. Instead, the question is whether no reasonable juror could disagree on these matters. The court finds Plaintiffs' evidence insufficient to put the question beyond dispute.

### B. Plaintiffs Can Pursue the Remaining Contract Claim on Behalf of A Class of All Emerald Club Members.

The February 23 order directed the parties to address whether this action satisfies Fed.R.Civ.P. 23(b)(3), which requires a plaintiff to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In making these findings, the court considers the following non-exclusive list of factors:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3). The purpose of the "predominance" and "superiority" requirements for a Rule 23(b)(3) class action is to ensure that class treatment will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quoting Fed.R.Civ.P. 23 advisory committee's notes (1966)).

As a preliminary matter, the court notes that its Rule 23(b)(3) analysis applies solely to Plaintiffs' breach of contract claim. In the February 23 order, the court noted that Plaintiffs made an independent claim for unjust enrichment, but that the parties had ignored it. Dkt. # 148 at 6 n. 3. Plaintiffs have continued to ignore the claim in their most recent submissions. The court has no basis to certify a class to pursue that claim.

### 1. Common Questions Will Predominate in the Resolution of Emerald Club Members' Breach of Contract Claims.

The February 23 order noted that at least "several" of the factual and legal issues that it resolved with respect to Plaintiffs' contract claims were common to all Emerald Club members. Dkt. # 148 at 29. Indeed, PBC does not argue that any issue that the court

resolved in that order would be resolved differently because of individualized issues affecting Emerald Club members other than Plaintiffs.[2] PBC instead argues that there are individualized issues that permeate the resolution of factual and legal questions that the court did not resolve in that order. The court disagrees.

### a. Common Questions Predominate In the Determination of Whether PBC Breached the Emerald Club Renewal Option.

■ Although individualized issues may bear on the determination of whether class members can enforce the renewal option in the Emerald Club Contract, Plaintiffs have demonstrated that common questions predominate. It is possible, of course, that individual Emerald Club members took actions to waive or forfeit their renewal options. A ticket holder might have told PBC directly that she would or would not renew. PBC may also have had individualized communications with ticket holders regarding the renewal option, although PBC presents no evidence suggesting as much. Indeed, the evidence suggests that to the extent PBC communicated with class members about the renewal option in 2008, it uniformly stated that it would not address the issue until the conclusion of the Key Arena lease litigation. *See supra* n. 1. There is no evidence of communication with Emerald Club members (other than Plaintiffs) after that litigation settled. No one has presented evidence suggesting that individualized communications about the renewal option happened in more than a few isolated instances. PBC must do more than simply point to the theoretical possibility of an individualized issue, it must provide evidence suggesting that it is likely that the issue bears on the claims of more than a few putative class members. In-

stead, the evidence suggests that the vast majority of Emerald Club members did nothing to pursue their renewal option, and thus no individualized issues about their conduct arise. Perhaps they were silent because they assumed PBC would initiate communications about renewal, as it had done in prior years. Perhaps they were silent because they were not interested in renewal. Their subjective motivations, however, are irrelevant, despite PBC's protestations to the contrary. The question is not why ticket holders did little or nothing to pursue renewal, it is whether they were required to do more to pursue renewal. That question is well-suited for resolution on a class-wide basis. As to the (presumably few) class members who had communications with PBC relevant to the renewal option, class certification would not prevent PBC from presenting evidence as to their conduct.

The conduct of the three named Plaintiffs stands alone as the exception to the apparent dearth of communication between PBC and Emerald Club members regarding renewal. Their communications, made almost entirely within the context of this litigation, no doubt raise individualized issues. PBC suggests, for example, that Plaintiffs' communications were a non-conforming counteroffer to the renewal option. But individualized issues as to three of approximately 1200 Emerald Club members do not undermine the court's predominance finding. Even if Plaintiffs waived their renewal option, they can still present evidence that the vast majority of Emerald Club members did not.

### b. Common Questions Predominate In Determining Damages.

■ Common issues abound in the analysis of contract damages as well. Assuming preservation of the renewal option, each Em-

**2.** The February 23 order disposed of Plaintiffs' CPA claims and requests for equitable relief. For reasons not apparent to the court, the parties suggest that questions related to these defunct claims are relevant to class certification. PBC agreed to resolve those claims in advance of class certification, acknowledging that this would limit its right to apply a favorable ruling to all potential class members. *See* Dkt. # 91 (Sept. 26, 2008 order at 3–4), Dkt. # 96 (PBC stating in Oct. 6, 2008 joint response that they wished to resolve summary judgment motions before class certification), Dkt. # 102 (Oct. 10, 2008 order noting that disposing of claims on summary judgment would not bind putative class members). Those claims play no part in the court's certification calculus.

erald Club member was entitled to season tickets for the equivalent of their Key Arena seats at Oklahoma City's Ford Center. Plaintiffs have proposed a single methodology for determining equivalent seats for all Emerald Club members. The court makes no determination about the validity of the methodology, but has no doubt that a methodology exists to determine seat equivalency on a class-wide basis. Once equivalency is established, damages are a simple matter of comparing the established market price of Ford Center tickets to the renewal price that the Emerald Club Contract guaranteed, along with any offset that PBC can prove. Although PBC's efforts to introduce individualized damage questions do not persuade the court that a class action is inappropriate, the court will now address those efforts in greater detail.

As PBC points out, a large number of Emerald Club members would appear to have no damages under Plaintiffs' proposed methodology, because the equivalent of their season tickets at the Ford Center are worth less than their Seattle Center tickets. As the court will address at the conclusion of the order, Plaintiffs must take appropriate steps to address this concern either by redefining the class to exclude Emerald Club members without damages or by providing appropriate notice. Regardless of what route Plaintiffs take, PBC has already demonstrated that it

is not unduly complicated to identify Emerald Club members who may lack damages. Using Plaintiffs' damages assessment, PBC has identified by name every putative class member who allegedly has no damages. Tondini Decl. (Dkt.# 156), Ex. 2. There is no indication that addressing concerns unique to that group will unduly complicate resolution of the claims of Emerald Club members.

■ Because Plaintiffs seek expectation damages for breach of the Emerald Club Contract, PBC suggests that the subjective expectations of each Emerald Club member are relevant to damages. The court is aware of no support for this novel view of contract law, and PBC provides none. As it did in the February 23 order, the court states the basic maxim that expectation damages are those that are *"reasonably foreseeable* by the party to be charged at the time the contract was made." Dkt. # 148 at 21–22 (citation omitted) (emphasis added). The subjective expectations of the parties are irrelevant to what they *reasonably* could have foreseen at the time of the contract. *See Ford v. Trendwest Resorts, Inc.,* 146 Wash.2d 146, 43 P.3d 1223, 1227 (2002) ("[T]he law of contracts seeks to protect an injured party's *reasonably expected* benefit of the bargain") (emphasis added). Subjective expectations do not govern the determination of contract damages.[3] Objectively reasonable expecta-

3. PBC does not advance its contention that subjective expectations matter in contract law by citing to cases in which courts declined to certify classes to pursue *non-contract* claims. For example, PBC observes that the Honorable Marsha Pechman of this District declined to certify a class in *Kelley v. Microsoft Corp.,* 251 F.R.D. 544 (W.D.Wash.2008). Judge Pechman, however, considered CPA claims based on deceptive advertising, and held that proof of those claims required a determination of "whether individual class members were actually deceived and whether they would have purchased their PCs but for [the deceptive] marketing." *Id.* at 558. This is a far cry from a contract case, where the knowledge and reliance of the plaintiff are irrelevant. Similarly inapposite is *Schwartz v. Upper Deck Co.,* 183 F.R.D. 672, 679–80 (S.D.Cal.1999), a civil racketeering case in which the certification-defeating individualized issue was whether an illegal lottery, rather than other aspects of the product, had induced each putative class member to purchase baseball cards. The court could continue through the litany of cases that PBC cited, but it would merely be repeating itself.

*See* Def.'s Br. (Dkt.# 155) at 12–17 (citing cases claiming fraud, misrepresentation, violations of consumer protection statutes, the Racketeering Influenced Corrupt Organizations Act, and antitrust statutes). It suffices to note that in only two of the cases PBC cited did the court decline to certify a class to pursue *contract* claims. In one, the court's discussion of contract issues is cursory, and PBC cites only the portion of the decision that discussed the plaintiff's CPA claims. *Davis v. Homecomings Financial,* No. C05–1466RSL, 2006 WL 2927702, at *6–8, 2006 U.S. Dist. LEXIS 77381, at *20–22 (W.D.Wash. Oct. 10, 2006). In the other, the court declined to certify a class of contract plaintiffs because of individualized questions relating to damages. *Pastor v. State Farm Mutual Auto. Ins. Co.,* 487 F.3d 1042, 1046, (7th Cir.2007). In *Pastor,* every plaintiff would have had a different claim for damages based on the extent of damage to his vehicle and the length of time for repairs. *Id.* That court was understandably reluctant to conduct an individualized hearing as to every class member's damages. In this case, the circum-

tions do, and the objectively reasonable expectations of the parties to the Emerald Club Contract are readily determinable on a class-wide basis. Indeed, the court noted in the February 23 order that the Emerald Club Contract itself touted the option to resell tickets, thus providing evidence of an objectively reasonable expectation that Emerald Club members could resell their tickets. Dkt. # 148 at 22.

PBC has identified one set of issues that at least arguably demands individualized determination. Those issues surround the question of whether Emerald Club members would have exercised their renewal option had PBC honored it. PBC argues that any individual member might not have renewed for numerous reasons: lack of money to pay for renewal, unwillingness to support PBC's unpopular management group, unwillingness to attend games in Oklahoma City or incur the burden and risk of reselling the tickets, or unwillingness to support the team in light of its poor 2008 season performance.

The court first puts this issue in its proper context: it bears solely on damages, not on whether PBC breached the Emerald Club contract. As the court previously noted, only the communications of Emerald Club members with PBC bear on whether they waived or forfeited their renewal options. Because the evidence suggests that the vast majority of members had no contact with PBC about renewal, this issue is well-suited for class resolution. Whether some members might not have intended to renew is not relevant to waiver or forfeiture.[4]

Assuming, however, that Emerald Club members preserved their renewal option, PBC can defend itself on the question of damages by proving that class members would not have exercised the option. The Restatement (Second) of Contracts states the relevant principle succinctly:

> A party's duty to pay damages for total breach by non-performance is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise.

RESTATEMENT (SECOND) OF CONTRACTS § 244 (1979) (quoted in *Puget Sound Serv. Corp. ("PSSC") v. Bush*, 45 Wash.App. 312, 724 P.2d 1127, 1130 (1986)). If PBC's failure to honor the renewal option placed it in total breach of the Emerald Club Contract, it can defend against a damage claim by presenting evidence that an individual class member would not have honored his remaining promise—the promise to pay the renewal price.

A discussion of cases considering this damages defense reveals its limitations. In *PSSC*, the court considered the suit of a lender and developer plaintiff for breach of a contract to purchase a condominium. 724 P.2d at 1128. The defendant purchasers had refused to pay the purchase price. *Id.* The trial court dismissed the suit because the plaintiff had failed to establish that it would have met financing conditions in the contract that were required before defendants' payment was due. *Id.* at 1128. Relying on § 244 of the Restatement, the court reversed because the trial court had inappropriately required plaintiff to shoulder the burden of proving that it would have complied with the financing condition. *Id.* at 1130 ("The burden of proof was on the [defendants] to demonstrate that, despite their improper repudiation, the condition precedent of providing the required financing would not have been satisfied."). Nonetheless, the court implicitly recognized that the defendant could have avoided damages by proving the plaintiff's inability to comply with conditions to completing the contract.

Although no Washington court other than the *PSSC* court has expressly adopted the language of § 244 of the Restatement, several courts have used similar reasoning. In

---

stances permit a damages determination without an individualized inquiry, as the court discusses later in this order.

4. PBC misinterprets several cases in which courts have focused on a party's intent in determining whether she waived a contract right. Def.'s Br. (Dkt.# 155) at 6–7 (citing cases). In

each of those cases, the court looked to whether the party's conduct communicated the intentional relinquishment of a contract right to the other party. None of these cases suggest that manifestations of intent not communicated to the other party are relevant.

*Palmer v. Clark*, 52 Wash. 345, 100 P. 749, 750 (1909), the defendant sold land subject to plaintiff's option contract before the exercise period for the option. The option holder sued. Rejecting the defendant's argument that the option holder could not prevail because it had neither paid the option price nor proved that it could pay the price, the court held that it is presumed, "in the absence of any showing to the contrary, that the [option holder] was able to perform the conditions of his contract." *Id.* at 751. In *McFerran v. Heroux*, 44 Wash.2d 631, 269 P.2d 815, 818–19 (1954), the court considered a suit by the holder of an option contract to purchase a speedway grandstand, a contract that included an obligation for the grandstand's owner to rebuild the grandstand should it suffer fire damage. A fire destroyed the grandstand, and the owner did not rebuild it to the option holder's satisfaction. *Id.* at 819. The option holder sued. Citing *Palmer*, the court held that to avoid damages, the defendant had the burden of proving that the option holder had no ability to pay the exercise price of the option. *Id.* at 820. Finally, in *Creegan v. Thompson*, 136 Wash. 606, 241 P. 10, 11 (1925), the court considered a suit for induced breach of a stock purchase contract by the stockholder against the corporate officials who refused to transfer his stock. The court held that because the evidence showed that the other party to the plaintiff's stock sale had the right to discontinue payments for the stock, and would have done so under the circumstances, the plaintiff "could not be damaged." *Id.*

Although these cases support a limited individualized damage defense, PBC has not established that the defense applies to any Emerald Club members. For example, like the defendant in *PSSC*, PBC could argue that some Emerald Club members could not have paid the price for 2009 season tickets. But, as with other individualized defenses that the court has discussed, PBC has no evidence to suggest that this defense is likely to apply at all broadly. Every Emerald Club member had the means to pay for 2008 season tickets. There is no reason to suspect, and certainly no evidence to prove, that a significant number of them would have been unable to do the same for the 2009 season.

Similarly, like the defendant in *Creegan*, PBC could argue that some objective external circumstance would have made it impossible for some Emerald Club members to profit from the renewal option. Its observation that some members had Key Arena tickets that are worth *more* than their Ford Center equivalents is a good example. With that exception, however, PBC has not offered evidence of any circumstance that would have made any Emerald Club member unable to profit from his or her renewal option. Once again, PBC has merely raised the possibility of an individualized defense, it has not presented evidence that the defense is likely to apply to a significant portion of the putative class, much less that resolving it on a class-wide basis is inadvisable.

Lacking evidence that it was objectively impossible for any Emerald Club member to complete his or her contract obligations or otherwise profit from the contract, PBC attempts to weave a defense from the possibility that individual Emerald Club members would not have chosen to exercise their renewal options. PBC asserts that for reasons unique to the 2009 season (the move to Oklahoma City, dislike of PBC's ownership group, uncertainty about ticket resale, etc.) and for reasons common to any group of season ticket holders, many Emerald Club members would have chosen not to renew. PBC also presents evidence that even over the Sonics' last five seasons in Seattle, a substantial portion of season ticket holders declined to renew their tickets each year. Tondini Decl. (Dkt.# 156), Ex. 3.

Objective and non-individualized evidence, however, suggests that information widely available to all potential 2009 season ticket holders showed that exercising the Emerald Club renewal option would be unusually profitable. PBC offered season tickets to no one until after it had resolved the Key Arena lease litigation in early July 2008, clearing the way for its move to Oklahoma City. Almost immediately thereafter, PBC extended Oklahoma City fans the right to request season tickets. Myers Decl. (Dkt.# 58), Ex. A (arena chart with pricing), Ex. C (release on Thunder website noting July 2–18 period in 2008 to sign up for season tickets). By Au-

gust 14, 2008, PBC had published individual ticket prices for all seats in its new arena. *Id.*, Ex. C. It also noted, at that time, that "thousands" of fans had signed up for season tickets, and that it would offer them the chance to select seats beginning on September 8. *Id.* News sources reported that PBC published season ticket prices on August 14 as well. *Id.*, Ex. B. On September 12, 2008, PBC announced that it had sold all of its 13,000 allotted season tickets in just five days of sales. Myers Decl. (Dkt.# 90), Ex. C. It also announced that it was creating a waiting list for those who were still interested in season tickets. *Id.* In addition, PBC issued policies for ticket holders that required them to resell their tickets only through the "TicketMaster Team Exchange" feature hosted on the Thunder website. *Id.*, Ex. D.

Although the court does not decide the issue, the evidence permits the conclusion that Emerald Club members would have had ample incentive to renew in 2009. Any Emerald Club member considering his or her renewal option could have easily ascertained that the option price was (in many cases) much lower than the season ticket price for the general public, that demand for season tickets was high, and that PBC itself provided a means to electronically resell tickets. If the evidence presented at trial is consistent, a jury could conclude that exercising the renewal option would have provided Emerald Club members with a relatively simple means to turn a profit. Unlike the picture PBC paints, the evidence suggests ample incentive and a relatively seamless means for Emerald Club members to renew and resell their tickets. A jury may of course decide that the evidence leads to a different conclusion, in which case Plaintiffs may fail at trial. The critical consideration for the court's purposes is that the evidence bearing on the apparent profitability of the Emerald Club option in the summer of 2008 is not individualized—it applies equally to all class members.

In the face of objective, non-individualized evidence that the Emerald Club renewal option was a valuable one, PBC asks the court to consider that individual Emerald Club members might have nonetheless failed to exercise the option for individualized, economically irrational reasons. This defense is a novelty. In the ordinary contract case, proof that the exercise of a contract will be lucrative for the plaintiff is enough to erase any question about whether he would have chosen to eschew the contract's benefits. For example, a plaintiff who sues based on a defendant's failure to honor a stock option contract would ordinarily not have to do more than show it would have been profitable for him to exercise the option. A defendant surely could not defend on the grounds that despite a readily available profit and the ability to realize it, the plaintiff would have irrationally chosen not to exercise the option. Yet PBC asks the court to do precisely that: to allow it to avoid class certification because it is possible that individual Emerald Club members would have failed for no rational reason to take advantage of a contract from which they stood to profit. The Washington cases the court has discussed do not support this defense, nor does any other authority of which the court is aware. The court declines to recognize it in this case.

### 2. A Class Action is the Superior Means of Resolving Emerald Club Contract Claims.

■ Not only do common issues predominate the resolution of Emerald Club members' contract claims, a class action is the superior means of resolving them. The four factors enumerated in Rule 23(b)(3) are a starting point for the superiority inquiry. The absence of planned or existing individual litigation by Emerald Club members suggests that a class action is an appropriate means of resolving their claims.[5] Fed.

---

5. PBC insists that the lack of individual litigation over the Emerald Club Contract demonstrates that such litigation lacks merit. It points out that some corporate members of the Emerald Club have potential damage claims for tens or even hundreds of thousands dollars, and that their failure to sue for those damages suggests that they do not believe they would prevail.

Again, PBC erroneously assumes that the subjective views of Emerald Club members matter. The court, like PBC, could speculate about why more people have not sued. Neither the court's speculation nor PBC's matters. The court's February 23 order establishes that Emerald Club members potentially have meritorious claims based on the breach of the renewal option. Why

R.Civ.P. 23(b)(3)(B). Emerald Club members are apparently uninterested in controlling individual litigation, even though many of them have claims for at least a few thousand dollars in damages. Fed.R.Civ.P. 23(b)(3)(A). Concentrating their claims in a Seattle court is a desirable because the vast majority of the Emerald Club members reside in the Seattle area. Fed.R.Civ.P. 23(b)(3)(C). PBC may be able to prove, either at trial or in advance of trial, that objective evidence supports individualized defenses applicable to a significant portion of the proposed class. If it succeeds in doing so, the court will have to consider either decertifying the class or allowing class members' claims to proceed to judgment solely on those issues that are suitable for class-wide resolution. *See* Fed R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."). On this record, however, the court concludes that common issues predominate, despite questions over PBC's damages defense. Even if the court must ultimately modify the scope of this action in light of PBC's defenses, a class action is superior to other methods for fairly and efficiently adjudicating the controversy between Emerald Club members and PBC.

**C. The Parties Must Take Additional Steps to Notify Class Members and Develop a Plan for Resolving this Action.**

For the reasons stated above, the court will certify a class. Plaintiffs ask the court to define the class essentially as follows:

> All 2006–2007 Seattle Supersonics season ticket holders (excluding courtside ticket holders) who renewed their season tickets in accordance with the Emerald Club Contract, regardless of whether they renewed after April 25, 2007. PBC employees and attorneys for the parties are excluded.

The court accepts that definition, but Plaintiffs must consider modifying it before they notify class members. It is possible that the above definition creates two subclasses with conflicting interests. As PBC has noted, the

evidence suggests that Plaintiffs espouse a damages methodology under which nearly half of the class has no damages. If Plaintiffs are proposing to distribute any class recovery to undamaged class members, then their claims may conflict with members who do have damages, who have an obvious interest in not having their recovery reduced in favor of undamaged Plaintiffs. If Plaintiffs are not proposing to distribute any recovery to undamaged class members, then they must inform class members in plain language before they decide whether to opt out of the class. Alternatively, Plaintiffs could redefine the class to exclude members without damages. Plaintiffs must address these issues in a supplemental filing with the court.

Whatever class ultimately receives notice, it shall be certified solely to pursue claims for damages based on the claim that PBC breached the Emerald Club contract by failing to honor the option to renew season tickets at fixed prices for the 2009 and 2010 seasons. At least the following issues remain to be decided:

(1) Whether PBC was obligated to notify class members of their renewal option in advance of the 2009 season, as it had done prior to the 2008 season. (As this is an issue of contract interpretation, the court will decide it, perhaps after taking an advisory verdict from the jury in accordance with Fed.R.Civ.P. 39(c)(1).)

(2) Whether class members waived or forfeited their renewal option.

(3) Assuming that PBC breached the Emerald Club contract by failing to offer the renewal option, and class members did not waive or forfeit the renewal option, what damages, if any, did class members suffer as a result of the breach.

The court appoints Keller Rohrback L.L.P. and Myers & Company, P.L.L.C. as class counsel.

Plaintiffs must now notify class members and give them an opportunity to opt out of this action.[6] Plaintiffs are not ready to noti-

---

individual ticket holders chose not to sue has no bearing on the merits of this suit.

**6.** PBC suggests that if the court is inclined to certify a class at all, it should certify an opt-in

fy class members, not least of all because PBC apparently has not provided them with the addresses of class members. PBC must provide that information. In the meantime, Plaintiffs must make several modifications to their proposed form of notice. First, Plaintiffs shall not refer to their dismissed CPA or equitable relief claims in the notice. They are free to state for explanatory purposes that the court has resolved other issues before deciding to permit class certification, but the notice form shall not dwell on those issues nor suggest that the court's resolution of those issues binds class members. The notice as currently drafted devotes too much attention to claims Plaintiffs cannot pursue on behalf of the class. The notice shall make clear that this class action will resolve only the Emerald Club Contract claim.

Second, Plaintiffs shall make sufficient disclosures in the class notice to explain their proposed damages methodology, and shall disclose whether that methodology will yield no damages for class members whose 2008 Sonics season tickets cost more than equivalent tickets at Ford Center. Plaintiffs shall provide sufficient information in the notice to permit class members to assess whether they are likely to have damages.

Upon receipt of a revised notice, the court will conduct either a teleconference or in-court hearing to finalize the notice and set deadlines for mailing notice and for class members to opt out. Plaintiffs must meet and confer with PBC before submitting the revised notice, so that they may at least consider whether to amend it in light of any objection from PBC.

In addition to completing notice, the parties shall meet and confer regarding a trial plan. The parties may, in light of this order, wish to pursue other discovery, or take other steps in advance of trial. When the court convenes to finalize Plaintiffs' form of notice, it will hear from the parties regarding those steps and proposed trial dates.

## IV. CONCLUSION

For the reasons stated above, the court DENIES Plaintiffs' motion for reconsidera-

tion (Dkt.# 150), and certifies this matter as a class action. The clerk shall terminate the motion calendar it created in accordance with the court's February 23 order. PBC shall provide Plaintiffs with the addresses of class members as soon as practicable. Plaintiffs shall submit a revised class notice no later than August 7, and accompany that notice with sufficient briefing to explain changes in the notice. PBC may object to the notice by August 21. The parties shall meet and confer in compliance with this order, and if they are unable to agree upon a plan for resolving this action after notice, they shall submit a joint statement explaining their differences no later than August 7.

IT IS SO ORDERED.

---

class. Fed.R.Civ.P. 23(c)(2)(B) contemplates opt-out classes only. PBC offered no authority to support its request, and the court declines to consider it further.